# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3351

FENG DONG,

*Petitioner*,

v.

ALBERTO R. GONZALES,
Attorney General of the United States,

*Respondent.*

———————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A77 950 711

———————

ARGUED DECEMBER 15, 2004—DECIDED AUGUST 31, 2005

———————

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Feng Dong, a native and citizen of China, claims that she was persecuted under China's one-child policy when Chinese officials forced her to abort her pregnancy. She applied for asylum, withholding of removal, and protection under the United Nations Convention against Torture. The Immigration Judge (IJ) denied all relief, and the Board of Immigration Appeals (BIA) summarily affirmed. The IJ gave multiple reasons for denying Dong's petition, all ostensibly relating to credibility. Because most of those reasons are either not supported by the record or are not central to her claim, we grant Dong's petition for review, vacate the IJ's decision, and remand for further proceedings.

## I

Dong, who is from Fujian province, testified at her removal hearing that in September 1996, when she was 19, she confirmed at a local hospital that she was one month pregnant. She then told her boyfriend, and they decided to get married. A week or two later, two men and two women from the village planning office visited Dong at home and asked her to accompany them to the hospital, for the stated reason that they wanted to confirm that she was not pregnant. Dong, her mother, and the four officials walked about 20 to 25 minutes to the hospital. There, not surprisingly, the officials learned that Dong was pregnant. When Dong refused to get an abortion, the officials told her that because she was not married and had not reached the legal age for marriage they would perform the abortion and then put her in jail. Although Dong told the officials that she wanted to keep her child, she underwent an abortion that day.

In response to questions from the IJ, Dong said that she did not know why the officials came to her house, but she speculated that they had been tipped off about her pregnancy by someone at the hospital where she had recently confirmed that fact. The IJ asked Dong why, if the officials already knew of her pregnancy, they would ask her to go to the hospital to check if she was pregnant. Dong speculated that the officials used this as an excuse to get her to the hospital for the abortion.

In the end, Dong did not marry her boyfriend. She remained in her hometown until January or February of 2000, when she paid $50,000 to a smuggler for a false green card, a Social Security number and passport, and travel to the United States. She made her way to Hong Kong and then flew from there to the United States. At the Newark airport, immigration officials determined that she was not eligible to enter and detained her, finding that she lacked

valid travel documents and had misrepresented her iden-
tity. The next day, during an interview by an officer of the
former Immigration and Naturalization Service (INS), Dong
said that the purpose of her trip to the United States was
"for fun," but added that she feared returning to China
"because of the one-child policy." At her hearing she
explained that she was afraid to tell the truth to the
interviewer because she did not trust the United States
government. She also explained that she did not apply for
political asylum at the airport because she did not know the
law in the United States.

Dong testified at her hearing that she did not want to
return to China because she did not want to be persecuted
again. Dong believed that she would be imprisoned in China
"because I came into the United States illegally and that
way it violated their regulation." Also, she thought that she
would be jailed because after she left China she was not
present for the required annual pregnancy check in her
hometown.

The INS initiated removal proceedings. In October 2000,
Dong requested a change of venue to Chicago. With that
request, Dong's attorney represented that she sought
asylum, but he did not file a formal asylum application for
her until July 2001. By then, more than a year had passed
since Dong's arrival in the United States, and as a result
she concedes that she was statutorily barred from asylum
relief. See 8 U.S.C. § 1158(a)(2)(B). (Because Dong has not
argued here that her attorney's informal statement satisfied
the one-year rule, we express no opinion on this point, or on
the question to what extent an applicant for asylum in her
position might perfect an existing application after the
expiration of the one-year period.)

In December 2001 Dong had a hearing before an IJ on her
request for withholding of removal, see 8 U.S.C.
§ 1231(b)(3), and her claim under the Convention Against

Torture. (On appeal, Dong has abandoned her request for relief under the Torture Convention.) The IJ denied her request for relief. He recognized that if Dong could prove that she was forced to abort a pregnancy, she would establish a well-founded fear of persecution. He concluded, however, that Dong did not qualify for relief because her testimony was not sufficient to establish that it was more likely than not that she would be subject to persecution if she returned to China. The IJ never actually said that he found Dong not to be credible, but he commented that it was "difficult to believe [Dong's] account relating to events central to [her] claim." The IJ gave two reasons for concluding that her testimony concerning her abortion was "not plausible":

> 1) the Court does not believe that four village officials would bother to come all the way to the respondent's house on foot in order to ask the respondent to go with them to the hospital to check if the respondent is pregnant. Such does not seem to be plausible. 2) it is not plausible that four village officials would walk 20 to 25 minutes from their office to the respondent's house and then walk another 20 to 25 minutes to the hospital with the respondent for a routine hospital examination to find out if the respondent was pregnant.

The IJ gave no reason for why he thought that the village officials might not be enforcing the population control rules, or why walks of this length in rural China were unlikely.

The IJ also found that Dong's testimony was inconsistent with the State Department Country Report in four ways. We note in passing that although the IJ identified the document that concerned him as a Country Report, the language that he quoted in his order is from *China: Profile of Asylum Claims and Country Conditions* (April 14, 1998) (Profile). First, Dong testified that she, as a female, could get married "around 22," but the IJ noted that the Profile

states that the minimum age for marriage in China is 22 for males and 20 for females. The IJ also found that the Profile contradicted Dong's testimony, because the Profile reported that: (1) in Fujian province, the U.S. Consulate General "is not aware of any forced abortions of illegitimate children or children of couples with an early marriage"; (2) "on visits to Fujian province, Consulate General officials found that strong persuasion through public and other pressure was used, but they did not find any cases of physical force actually employed in connection with abortion or sterilization"; and (3) "it has been reported that if a couple conceived a child before the legal marriage, the child would be treated as if it were born out of wedlock."

The IJ also said that he had "particular difficulty" with Dong's claim for six additional reasons: (1) she presented fraudulent documents upon entering the United States; (2) she did not apply for asylum at the airport; (3) she did not apply for asylum within a year of her arrival; (4) she did not corroborate her claim with supporting documents; (5) she did not submit an affidavit from her mother; and (6) she remained in China for four years after her alleged abortion without any problems.

Dong appealed the IJ's decision, and the BIA summarily affirmed.

## II

Dong is eligible for withholding of removal if she can show that there is a "clear probability" that she would be persecuted if forced to return to her native country. *INS v. Stevic,* 467 U.S. 407 (1984); see 8 U.S.C. § 1231(b)(3); *Lin v. Ashcroft,* 385 F.3d 748, 751 (7th Cir. 2004). If Dong can establish that she suffered past persecution, she is entitled to a presumption, subject to rebuttal by the government, that her "life or freedom would be threatened in the future in the country of removal on the basis of the original claim."

8 C.F.R. § 208.16(b)(1)(i); see *Zheng v. Gonzales,* 409 F.3d 804, 810 (7th Cir. 2005); *Zaidi v. Ashcroft*, 377 F.3d 678, 681 (7th Cir. 2004); *Vladimirova v. Ashcroft*, 377 F.3d 690, 695 (7th Cir. 2004). Dong alleged that she was persecuted based on her forced abortion. Congress has expressly addressed forced abortion in 8 U.S.C. § 1101(42), which states that a person who has been forced to abort a pregnancy "shall be deemed to have been persecuted on account of political opinion." See also *Zhang v. INS*, 386 F.3d 66 (2d Cir. 2004). Thus, if the IJ had credited Dong's claim that she was forced to have an abortion, she would "automatically [be] entitled to the presumption of a well-founded fear of future persecution." *Zheng*, 409 F.3d at 810; see *Lin*, 385 F.3d at 757.

When the BIA affirms an IJ's ruling without opinion, see 8 C.F.R. § 1003.1(e)(4), we review the IJ's decision directly. *Lin*, 385 F.3d at 751. An IJ's credibility determination is entitled to great deference. See *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003). Nevertheless, we "will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003). An IJ's credibility determinations "must be supported by specific, cogent reasons that bear a legitimate nexus to the finding." *Uwase*, 349 F.3d at 1041 (internal quotations omitted).

On appeal Dong challenges each of the IJ's reasons for rejecting her testimony. She argues that the IJ's reasons for his conclusion were not supported in the record, and that the documentary evidence the record contained did not contradict her testimony. Dong concedes that she entered the United States using false documents, did not apply for asylum at the airport or within one year of her arrival, and remained in China for four years after her abortion without any problems, but she maintains that these facts, either taken individually or collectively, are not valid reasons for discrediting her testimony. Finally, Dong argues that

because her testimony was credible, she was not required to corroborate it further.

The IJ found Dong's story "not plausible," but his skepticism is not supported by evidence in the record. Dong offered a reasonable explanation for the village officials' conduct, stating that the officials had probably learned of her pregnancy from the hospital where she had her pregnancy test and wanted to take her back to the hospital so she could have an abortion. The IJ doubted that four officials would trouble to pay a visit just to see whether Dong was pregnant, but his opinion on this point is inconsistent with the Profile he cited, which speaks of strong pressure that officials exert to enforce the family-planning policies. Moreover, the number of officials who visited Dong has little bearing on whether her abortion was forced. See *Lin,* 385 F.3d at 755 (number of people who took petitioner to hospital is "a factual point that has little bearing on whether she was forced to abort her pregnancies"); *He v. Ashcroft*, 328 F.3d 593, 600 (9th Cir. 2003) ("Whether five people or ten people came to take his wife for involuntary sterilization, it would nonetheless be involuntary.") There is nothing in the record that affirmatively supports the IJ's assumption that village officials would not act as Dong described. The IJ's skepticism alone, in light of Dong's consistent testimony, does not support a negative credibility determination. See *Huang v. Gonzales*, 403 F.3d 945, 949-50 (7th Cir. 2005) (portion of IJ's decision "based entirely on either the judge's personal beliefs or some perceived common knowledge" not proper basis for adverse credibility finding); *Lin*, 385 F.3d at 755 (IJ's skepticism "utterly unsupported by any fact in the record" insufficient basis for adverse credibility finding); see also *Elzour v. Ashcroft*, 378 F.3d 1143, 1153 (10th Cir. 2004) (holding that IJ's skepticism must be substantiated by record).

The IJ's finding that Dong's testimony was contradicted by the Country Profile is similarly flawed. Although the

Profile says that the *minimum* age for marriage in China is 22 for males and 20 for females, it also says that "[i]n some localities the ages are set higher." The IJ did not point to any information showing that the marriage age was not higher in Dong's locality. More importantly, whether the marriage age was 20 or 22 was irrelevant to Dong's situation, because under either minimum she was too young at 19 to get married when she learned that she was pregnant.

The portions of the Profile on which the IJ relied do not contradict Dong's testimony. Although the Profile reports that U.S. officials had not seen proof of forced abortions, it notes that Chinese officials "acknowledge that there may be instances of force being used" to compel a person to submit to an abortion. And the Profile "could not exclude the possibility" that couples who married early would be forced to abort a pregnancy. Indeed, the U.S. Department of State *Country Reports on Human Rights Practices, China* (released February 2001), lends support to Dong's testimony. It states that it is illegal for unmarried women to bear children and although force is officially prohibited,

> intense pressure to meet family planning targets set by the Government has resulted in documented instances in which family planning officials have used coercion, including abortion and sterilization, to meet government goals. During an unauthorized pregnancy, a woman often is paid multiple visits by family planning workers and pressured to terminate the pregnancy. In 1998 a former Fujian province local family planning official stated that local authorities in a Fujian town systematically used coercive measures such as forced abortion and sterilization, detention, and destruction of property to enforce birth quotas.

Neither the Profile nor the Country Report rule out the possibility that forced abortions occur; thus, the IJ erred in relying on these reports to find Dong not credible. More-

over, an IJ should not rely on generalized Profiles or Country Reports to refute an applicant's personal experience. See *Lin*, 385 F.3d at 754; *Bace v. Ashcroft*, 352 F.3d 1133, 1139 (7th Cir. 2003) ("[I]t would be improper to find that a witness's credibility about specific events could be 'contradicted' by a generalized State Department report broadly discussing conditions in the applicant's country of origin.").

Finally, the remaining reasons that caused the IJ "particular difficulty" are largely beside the point. It is not relevant to Dong's credibility that she avoided persecution during the four years she remained in China after her abortion. For all anyone knows, she did so by avoiding pregnancy, which is hardly a solution to the problem. Furthermore, one forced abortion is sufficient to show persecution; Dong does not have to show a string of such incidents. See 8 U.S.C. § 1101(42); *Ding v. Ashcroft,* 387 F.3d 1131, 1133 (9th Cir. 2004).

As for the false documents, the BIA has distinguished between use of false documents to establish an element of an asylum claim and the use of false documents for entry purposes. Although an IJ may find an applicant not credible when she uses false documents for the former purpose, the "use of false documents to facilitate travel or gain entry does not serve to impute a lack of credibility to the petitioner." *In re O-D-,* 21 I. & N. Dec. 1079, 1081 (BIA 1998); see also *Yongo v. INS,* 355 F.3d 27, 33 (1st Cir. 2004); *Akinmade v. INS,* 196 F.3d 951, 956 (9th Cir. 1999). Because Dong's use of false documents to enter the United States has no bearing on whether she was forced to terminate her pregnancy, we reject this reason as a basis for the IJ to find Dong not credible.

Dong's statement to an immigration officer that she came to the United States "for fun" also troubled the IJ. Airport interviews, however, are not always reliable indicators of

credibility. See *Huang*, 403 F.3d at 950; *Balogun v. Ashcroft*, 374 F.3d 492, 505 (7th Cir. 2004). And in Dong's case, the airport interview as a whole supports her claim. Later in the same interview to which the IJ referred, Dong told the immigration officer that she feared returning to China because of the one-child policy, suggesting that this was not a thought that occurred to her only after she obtained counsel. Finally, her failure to apply for asylum within one year of her arrival appears to be more relevant to her attorney's level of competence than to her credibility. The IJ gave no weight to counsel's informal statement, but to the extent it sheds any light at all on her intentions, it indicates that asylum was her goal.

Inconsistent statements and failure to file a timely asylum claim can be valid reasons for finding an alien not credible, but they cannot save the IJ's overall determination in this case. Because the other reasons given by the IJ for denying relief are either unsupported by the evidence in the record or not central to Dong's claim, we decline to affirm the IJ's decision on these two weak grounds for finding Dong not credible. See *Huang v. Gonzales*, 403 F.3d 945, 950 (7th Cir. 2005) (remanding where court had "misgivings" about all but one of IJ's reasons for adverse credibility finding); *Georgis*, 328 F.3d at 970 (remanding where five of six reasons given by IJ for discrediting petitioner were unsupported).

The lack of support for the IJ's credibility determination makes it difficult to evaluate the remaining reasons he gave for denying her claim—that Dong did not provide any supporting documents or a letter or affidavit from her mother in support of her claim. We have held that "[c]orroborating evidence is essential to bolster an otherwise unconvincing case," but when an applicant testifies credibly, "it is not necessary for her to submit corroborating evidence in order to sustain her burden of proof." *Lin,* 385 F.3d at 751 (quoting *Uwase*, 349 F.3d at 1041); *Georgis,* 328

F.3d at 969; *see also* 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.")). And in order to deny asylum relief for lack of corroborating evidence, an IJ must: (1) make an explicit credibility finding; (2) explain why additional corroboration is reasonable; and (3) explain why the alien's explanation for not producing the requested corroboration is inadequate. *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004); *see also Huang*, 403 F.3d at 951. Here, the IJ did not explain why additional corroboration was reasonable, and he never asked Dong why she did not provide supporting documentation. As a result, we conclude that the lack of corroborating evidence cannot support the IJ's decision.

## III

For these reasons, we find that the IJ's decision is not supported by substantial evidence. Upon remand, if the agency finds credible Dong's story that she was forced to have an abortion, she is entitled to a presumption that she will be persecuted upon her return to China. See 8 C.F.R. § 208.16(b)(1)(I). The IJ will then need to decide whether, with the benefit of that presumption, she has shown that it is more likely than not that she would be subject to persecution if she returns to China. We GRANT Dong's petition for review, VACATE the IJ's decision, and REMAND to the BIA for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*