[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 17, 2010
JOHN LEY
CLERK

No. 08-13849

_____

Agency No. A95-708-709

YU XIA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(June 17, 2010)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,* District Judge.

TJOFLAT, Circuit Judge:

Petitioner Yu Xia petitions this court for review of the decision of the Board

_____

* Honorable Edward R. Korman, United States District Judge for the Eastern District of
New York, sitting by designation.

of Immigration Appeals ("BIA") affirming the denial, by an Immigration Judge

("IJ"), of her claims for asylum, withholding of removal, and relief under the

United Nations Convention Against Torture ("CAT"), and ordering her removal.

We deny Xia's petition.

I.

Yu Xia was born on September 10, 1985, in Lianjiang County, Fujian

Province, China.  Xia entered the United States at Los Angeles International

Airport without a visa on March 20, 2005, and, four days later, received a notice to

appear in removal proceedings.  Xia conceded removability based on the

allegations of the notice.[1]  On January 11, 2006, however, she filed an application

for asylum, withholding of removal, and relief under the CAT, claiming past

persecution based on her political opinion.  Specifically, Xia claimed that she

became pregnant while in a relationship with her boyfriend; as she was eighteen

years old at the time and he was twenty-one, both were too young to marry under

Chinese law.  She claimed that on November 10, 2004, agents of the county

government came to her home, told her she had violated the Chinese family

planning law (because she was unmarried and became pregnant without

---

[1] The notice to appear charged Xia with being a non-citizen of the United States who arrived at Los Angeles International Airport and applied for admission without possessing valid entry documents, making her subject to removal under § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I).

2

government permission), and took her to a local hospital where they forced her to undergo an abortion. She further claimed that, after complaining to the local family planning office about her forced abortion, officials there chased her out and threatened her with arrest and violence if she complained again. As a result, Xia feared harm or mistreatment at the hands of the national and local Chinese governments if she were returned to China; she feared she could be arrested for having left China illegally and would once again be subject to China's family planning law and forced to have an abortion if she became pregnant again.

On September 28, 2006, Xia, represented by counsel, appeared before an IJ for a hearing on her asylum application. On direct examination, Xia's attorney asked her about the circumstances surrounding her forced abortion:[2]

Q.    Okay.  Now you stated Government persecution.  When did it start?
A.    Since November 10th, 2004.
Q.    Why was the Government persecuting you on or about November 10th, 2004?
A.    I was, was pregnant before marriage, prior, before marriage.  The pregnancy was before the mandatory age of China, to get pregnant.
Q.    Now how old were you when you got pregnant if you remember.
A.    18 year old.
Q.    So what year did you get pregnant?
A.    2004.
Q.    And ma'am, who impregnated you?
A.    My boyfriend.

---

[2] In some portions of the hearing transcript, the designations for "Question" and "Answer" were reversed.  We have changed those designations to correctly reflect the course of the examination.

3

. . . .

Q.   Okay.  Now you stated earlier that you had problems studying [sic] around November 10th, 2004.  What happened to you on that date?

A.   On November 10th, I was alone at home.  A few people from Family Planning Department came to my home wanted to take me to the hospital doing tests to make sure that, to check and see if I was pregnant.

. . . .

Q.   Okay.  What happened when these officials came to your house?

A.   I was forcibly taken into a seven passenger van and taken to a local hospital.

Q.   What do you mean you were taken forcefully?

A.   They dragged me.  They pushed me into the van.

Q.   And where were you taken to?

A.   Local county hospital.

Q.   Do you remember the name of the local county hospital?

A.   Yen Chow Hospital (phonetic sp.)

Q.   And what happened when you got to the hospital?

A.   I was forced to take urine test.

Q.   What do you mean you were forced to take a urine test?

A.   One, a nurse went into the restroom with me and watched to make sure that I did the urine test.

Q.   Okay.  Then what happened after that?

A.   One hour later they got test results and she confirmed that I was pregnant and I was forced, I was taken, forcefully taken to the operation room.

Q.   Did you have an abortion?

A.   At that time not yet but later two nurses hold me, hold my legs down and two other people hold down my arms and then the doctor plugged a tube into me, forced me to do the abortion.

Q.   Now were you ever asked whether or not you wanted an abortion?  Were you asked whether or not you wanted to have an abortion?

A.   No.

To corroborate her claim that she was forced to have an abortion, Xia

4

attached to her asylum application a document purporting to be a "Family Plan Birth Control Operation Certificate," in both Mandarin and an English translation thereof. This "abortion operations certificate," as the IJ termed it, listed Xia's name and gave a doctor's signature dated November 10, 2004. The abortion certificate had spaces to list a patient's age and sex,[3] both of which were blank on Xia's certificate.

On cross-examination, the Government's attorney questioned Xia about when she discovered she was pregnant, as well as her age when she had the abortion:

Q.    And you say you got pregnant in July of 2004. Is that correct?
A.    Yes.
Q.    When did you learn that you were pregnant?
A.    When I supposed to, my period supposed to start, I knew.
Q.    So was that in July or August?
A.    July.
Q.    And whom did you tell you were pregnant?
A.    My boyfriend.
Q.    Anyone else?
A.    No.
Q.    And you didn't tell your parents, correct?
A.    No.
Q.    So they didn't know you were pregnant?
A.    They later found out and the reason I was vomiting responding to the pregnancy. They found out on their own but I did not tell them.
Q.    When did they find out?
A.    Two months later.

---

[3] Either a male or a female could have used the certificate, as it included the following "Birth Control Type[s]": vasectomy, sterilization, IUD, induced abortion, or "other." On Xia's certificate, "other" was followed by the entry "abortion."

5

Q. In September?
A. September, end of August.

. . . .

Q. Now you said that you were 18 when you had the abortion? When you had the abortion.
A. Yes.
Q. So, but this was in 2004, right?
A. Yes.
Q. November.
A. Yes.
Q. And you were born in 1985? So wouldn't you have been 19?
A. I didn't know how to calculate American birthdays.

Xia's attorney asked no questions on redirect examination. The IJ then questioned Xia. One line of her questioning concerned Xia's attendance at college soon after Xia discovered she was pregnant:

Q. And how did your parents react when they found out at the end of August about your pregnancy?
A. They told me to stay at home, not go, don't go out.
Q. Did you do that?
A. Yes. I stayed at home.
Q. How did you go to Fuqing College for the one month?
A. They decided going to college, I have a choice to equip myself with some knowledge is better choice for me than staying at home.
Q. So when did your parents change their mind about you going out?
A. About five days later.
Q. So that would have been August of 2004 too?
A. You're right.
Q. Okay. So your parents were okay with you're [sic] going to college being pregnant which was going to be eventually visible?
A. They noticed that I was unhappy staying at home so they decided to let me out and go to college.

Following closing arguments from both sides, the IJ issued an oral decision

6

denying Xia's application for asylum, withholding of removal, and CAT relief, and ordering Xia's removal.[4]  The IJ concluded that Xia "failed to credibly demonstrate that she suffered past persecution or that she has a well-founded fear of persecution in China on account of her race, origin, nationality, membership in a particular social group, or political opinion."  The IJ based her adverse credibility determination on several of Xia's testimonial infirmities.  First, the IJ noted the discrepancy between Xia's statement that she was eighteen when she had the abortion and the fact that based on her date of birth, she would have been nineteen if she had the abortion on November 10, 2004.  Second, the IJ found it unbelievable that Xia started attending college beginning in September 2004 when she was already approximately three months pregnant and her pregnancy would soon become visible.  Third, while she acknowledged that she was not a forensic expert, the IJ questioned the reliability of the abortion operations certificate given that it did not "reflect [Xia's] age, sex, or gender."  The IJ added that "documentation regarding forced abortions [is] rarely issued.  [She] found highly implausible [Xia's] claim on cross-examination that she was not administered any type of anesthesia during the abortion" and observed that Xia had not submitted

---

[4] The IJ's decision addressed Xia's claim for asylum.  Because an alien's burden of proving entitlement to withholding of removal or CAT relief is more demanding than the burden of proving eligibility for asylum, see, e.g., Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 891 (11th Cir. 2007) (per curiam), Xia's failure to prevail on her asylum claim meant that she could not prove entitlement to withholding of removal or CAT relief.

any other documentation to establish her claim of a forced abortion. The IJ also noted that Xia had not credibly demonstrated her identity, given that she did not have valid immigration documentation when she entered the United States and did not provide such pre-entry documentation to the Immigration Court. The IJ concluded that she was not

> persuaded by [Xia's] claim that she was subjected to a forcible abortion on November 10th, 2004 if in fact she was pregnant. The Court has reached such conclusion given the background material in the Country Reports and Profile as well as its evaluation of the alleged abortion operations certificate within the asylum application and copy form.

(Emphasis added).

The IJ's decision relied in part on two documents published by the United States Department of State: the 2005 Country Report on Human Rights Practices for China ("2005 Country Report") and the 2004 Profile of Asylum Claims and Country Conditions for China ("2004 Profile") (collectively the "State Department Reports"). As the IJ summarized them,

> [w]ith respect to the Family Planning Policy, both the 2005 Country Reports and the Profile acknowledge that the implementation of the Family Planning Policy varies depending on location and is more enforced in the cities rather than in the rural areas. Both the 2005 Country Reports and the profile for June of 2004, also acknowledge that despite the September 2002, National Family Planning Law that prohibits the use of physical coercion to compel persons to submit to abortion or sterilization, in certain instances such prohibitions [are] not followed. Specifically, the June 2004 report on page 21 indicates that there have been reports that physical coercion continues to occur

8

in rural areas.

The IJ stated that she "carefully considered the background material in the record within the 2005 Country Reports and in a June 2004 profile." She also noted the State Department Reports' statements that while some local officials had violated the prohibition on the use of physical coercion to enforce the family planning law, these were considered isolated incidents and the officials responsible were punished. Lastly, she noted from the State Department Reports that China's family planning policy was less rigorously enforced in rural areas than in cities, and that many women chose to have voluntary abortions rather than pay the "social compensation fees" that were required for violations of the policy. Based on her reading, the IJ found Xia's claim that she was forced to undergo an abortion inconsistent with the material in the State Department Reports. Instead, the IJ found it more likely, "[b]ased on the evidence of record," that Xia had a voluntary abortion on November 10, 2004, and that her claim of past persecution based on opposition to China's family planning policy was unfounded.[5]

_____

[5] The IJ also rejected Xia's claim of a well-founded fear of future persecution. While Xia testified that she feared returning to China because she would not be able to marry and have the number of children she wanted because she would be subject to the family planning policy, the IJ found that she was 21 at the time of the hearing—of legal age for women to marry in China—and that the family planning policy applied equally to all Chinese women. With respect to Xia's claim that she would be subject to punishment or physical harm for illegally leaving China, the IJ found that Xia had submitted no documentation to support that claim and credited the Government's evidence that "U.S. officials in China have not confirmed any cases of abuse of persons returned to China from the United States for illegal entry."

It is clear from the record that the State Department Reports played some role in the IJ's decision to deny Xia's claims. The State Department Reports, though, were by no means the only findings the IJ made that led her to deny Xia's claims "for failure of proof and lack of credibility."

Xia appealed the IJ's decision to the BIA, and, on June 19, 2008, the BIA affirmed. In its decision, the BIA devoted one paragraph to the merits of Xia's asylum claim. The BIA found that the IJ did not clearly err in determining that Xia's testimony was not credible, pointing to the date-of-birth discrepancy, the purported abortion certificate, and the conflict between Xia's claim and the evidence suggesting that most women with unauthorized pregnancies paid social compensation fees rather than underwent forced abortions as inconsistencies going to the heart of Xia's asylum claim.[6] In her petition for review submitted to this court, Xia raises one issue: "Whether the IJ's denial of [her] application for asylum is supported by substantial evidence." In addressing this issue in her brief, Xia argues that the IJ erred in finding her testimony not credible based on the State Department Reports; thus, the IJ's denial of asylum was not supported by substantial evidence.

II.

We review only the BIA's decision except to the extent that the BIA

---

[6] Xia did not attempt to explain these discrepancies in her appeal to the BIA.

10

expressly adopts the IJ's opinion or reasoning.  Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).  Here, the BIA issued its own opinion, but also adopted parts of the IJ's oral decision regarding the credibility of Xia's testimony. Therefore, we review both the BIA's decision and the IJ's reasoning supporting the adverse credibility determination.

An IJ's finding that the testimony of an asylum applicant is not credible is a finding of fact.  In reviewing such a finding, the substantial evidence standard requires that we affirm the finding if it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  Id. (quoting Lorisme v. INS, 129 F.3d 1441, 1444–45 (11th Cir. 1997)).  To reverse the finding under that standard, we must conclude "not only that the evidence supports a contrary [finding], but that it compels one."  Farquharson v. U.S. Att'y Gen., 246 F.3d 1317, 1320 (11th Cir. 2001).  That is, "the mere fact that the record may support a contrary [finding] is not enough to justify a reversal of the . . . finding[]." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).  This deferential standard prevents us from "'reweigh[ing] the evidence from scratch.'" Id. (quoting Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001)).

We acknowledge that in Tang v. U.S. Attorney General, 578 F.3d 1270, 1280 (11th Cir. 2009), a panel of this court decided that an IJ may not select portions of a State Department Country Report that undermine an asylum

11

applicant's claim while ignoring those portions that support the claim. Here, it is true that the IJ said that she "carefully considered" the background material in the State Department Reports. But the IJ's adverse credibility determination rested on far more than those two documents. The discrepancy in how old Xia said she was when she had the abortion versus her actual age at that time based on her birthday, the incredibility of her decision to start college when her pregnancy was about to show, her lack of evidence confirming her identity, and the unreliability of Xia's purported abortion certificate were all ample evidence from which the IJ could have made the adverse credibility determination—even leaving aside the State Department Reports. We must affirm this decision as long as, based on the entirety of the record, the decision is based on reasonable, substantial, and probative evidence. Al Najjar, 257 F.3d at 1284. Our review of the record leads us to conclude that it is.

The substantial evidence standard means that we "'view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision.'" Tang, 578 F.3d at 1276 (quoting Adefemi, 386 F.3d at 1027). In that vein, "a denial of asylum relief can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence." Id. at 1276–77 (citing Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005)). Lastly, the REAL ID Act of 2005, Pub. L. No.

109-13 § 101, 119 Stat. 302, granted more latitude to IJs in making credibility

determinations in applications for asylum and withholding of removal filed (as

Xia's was) after May 11, 2005:

> Considering the totality of the circumstances, and all relevant factors,
> a trier of fact may base a credibility determination on the demeanor,
> candor, or responsiveness of the applicant or witness, the inherent
> plausibility of the applicant's or witness's account, the consistency
> between the applicant's or witness's written and oral statements
> (whenever made and whether or not under oath, and considering the
> circumstances under which the statements were made), the internal
> consistency of each such statement, the consistency of such statements
> with other evidence of record (including the reports of the Department
> of State on country conditions), and any inaccuracies or falsehoods in
> such statements, without regard to whether an inconsistency,
> inaccuracy, or falsehood goes to the heart of the applicant's claim, or
> any other relevant factor.  There is no presumption of credibility,
> however, if no adverse credibility determination is explicitly made,
> the applicant or witness shall have a rebuttable presumption of
> credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii).

In a Seventh Circuit case, Dong v. Gonzales, 421 F.3d 573 (7th Cir. 2005),

the petitioner, Dong, had a background remarkably similar to Xia's: a nineteen-

year-old woman from Fujian Province, who became pregnant by her boyfriend,

was taken by officials from her village's family planning office to the hospital.

There, after the officials discovered she was pregnant, they forced her to undergo

an abortion.  Id. at 574–75.  She entered the United States without a visa and

claimed both past persecution based on her political beliefs and fear of future

13

persecution, in that she would face punishment in China for leaving that country illegally. Id. at 575.

At the conclusion of a merits hearing before an IJ, the IJ denied Dong's request for withholding of removal and relief under the CAT. In doing so, the IJ did not explicitly find Dong's testimony not credible; instead, he labeled the testimony "not plausible" without explaining why it was so. Id. at 576. The BIA summarily affirmed the IJ's finding, but the Seventh Circuit reversed, holding that the IJ lacked a sufficient evidentiary basis for his mere skepticism about Dong's account of the material events. The Seventh Circuit also took issue with the IJ's reliance on the State Department Reports (the same ones used in Xia's case, albeit from different years) because the IJ used the general accounts in them to refute specific parts of Dong's story. Id. at 578.

In this case, in contrast to Dong, the IJ gave well-explained reasons for finding Xia's account not credible. The IJ was more than merely skeptical about Xia's account; the IJ listed several discrepancies and omissions that rendered it less than believable. Those reasons still stand even if the State Department Reports are removed from consideration, as Xia's testimony included at least one internal inconsistency (how old she was when she had the abortion) and one omission (identifying data on the abortion operations certificate). Xia did not provide corroborating evidence that would have rebutted these inconsistencies and

14

omissions. That is, the totality of the record provides ample support for the IJ's specifically stated finding that Xia's testimony regarding the critical events at issue was not credible.

The IJ offered "specific, cogent reasons," supported by the record, for determining that Xia's testimony was not credible. Shkambi v. U.S. Att'y Gen., 584 F.3d 1041, 1049 (11th Cir. 2009) (per curiam) (quoting Forgue, 401 F.3d at 1287). This record does not compel us to reverse that determination. Accordingly, we affirm the BIA's decision and deny Xia's petition for review.

PETITION DENIED.