[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10535
Non-Argument Calendar

_____

Agency No. A201-429-499

ALBERT YAW OPPONG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(September 15, 2020)

Before JILL PRYOR, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Albert Yaw Oppong, a native and citizen of Ghana, petitions for review of the Board of Immigration Appeals' ("BIA") dismissal of his appeal of the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158(a), 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). With regard to his asylum claim, Oppong asserts that the record compels us to reverse the BIA's adverse credibility determination and conclusion that he failed to submit sufficient corroborating evidence. He relatedly argues that the BIA erred in denying his claims for withholding of removal and CAT relief because it failed to consider objective, corroborating evidence.[1] We conclude that Oppong cannot prevail on any of these arguments and therefore deny his petition.

I.

Oppong illegally entered the United States in December 2018 without a valid entry document and without having been admitted or paroled into the country. Shortly thereafter, Oppong, who was not represented by counsel at the

---

[1] Oppong also asks us to direct the BIA to consider whether the IJ erred in dismissing his claim in the alternative on discretionary grounds. The IJ held that even if Oppong had qualified for asylum relief, it would deny that relief because he travelled through eight countries, all of which signed the 1951 U.N. Convention on the Status of Refugees, without requesting protection. Because we find no error in the BIA's dismissal of his claim on the grounds stated, we decline to address this argument.

time, participated in a credible fear interview ("CFI") with an asylum officer. What he said—or rather what he did not say—during that interview is critical.

Following some preliminary questions, the asylum officer began the credible fear portion of the CFI by asking why Oppong left Ghana.  Oppong responded that "some people in [his] community want to kill [him] because [he is] gay and [] practicing something that they don't believe in [his] country."  When the asylum officer asked whether anyone in particular wanted to kill him, Oppong identified only a group of people that attacked him in October 2018, but when asked if he knew the people who attacked him, Oppong stated that he did not.  The asylum officer then asked whether the 2018 attack was "the only time [he was] physically harmed," and Oppong replied: "[Y]es. I was stabbed in the stomach."  Prompted for more information, Oppong explained that the group broke into his bedroom at night while he was with his partner.  Although his partner was able to flee out of the window and evade capture, the group pulled Oppong outside into the front yard, beat him, and stabbed him in his stomach.  Oppong passed out and woke up in the hospital.

At the end of the CFI, the asylum officer read Oppong the following summary:

> You fear that a group of people in your community will kill you in Ghana.  You were at home with your partner one night sleeping when a group of men came and knocked down your door beat you up and stabbed you.  You passed out and woke up in the hospital after having

3

an operation.  The doctor who treated you hid you in his home until you recovered and then your partner came to get you and escaped the country.  Prior to this attack you received many phone calls threatening to kill you after you began going out with your partner two years before.  You did not report the attack to the police because they do not protect people who are gay since it is against the law in Ghana to have [a] relationship with a male.

The asylum officer asked if this summary was accurate and Oppong confirmed that it was.  The asylum officer asked if he would like to change or add anything and Oppong responded: "[A]ll I can say is that I need protection now [and] I don't want to die."

In February 2019, the Department of Homeland Security served Oppong with a Notice to Appear, charging him with being removable under INA §§ 212(a)(7)(A)(i)(I) and 212(a)(6)(A)(i), 8 U.S.C. §§ 1182(a)(7)(A)(i)(I) and 1182(a)(6)(A)(i).  At a master calendar hearing, Oppong conceded that he had entered the United States without a valid entry document and the IJ sustained the charge of removability.  Through counsel, Oppong applied for asylum, withholding of removal, and CAT relief, alleging persecution based on his membership, as a gay man, in a particular social group.  In support of his application, Oppong submitted an affidavit.

It is noteworthy that Oppong's asylum application and the accompanying affidavit contain significantly more information than did his CFI.  In addition to the 2018 attack that Oppong described in his CFI, Oppong alleged in his

4

application that his family, community, and the police had "harmed, mistreated, and threatened [him] on many different occasions," since he came out as gay in 2009. More specifically, Oppong attested to the following events in his affidavit: After Oppong told his high school classmates that he was not attracted to women, a male classmate raped him several times. Oppong was afraid to report his assault to the police, however, because his first consensual male partner's family threatened to call the police after discovering their relationship. He had also observed that police did not investigate the killings of gay men reported on the news. Oppong did not tell his family that he was gay until his 30th birthday, which prompted his father to begin abusing him and his mother to disown him, tell people in the community he was gay, and attempt to poison him (which he did not report to the police due to fear).

Oppong also stated in his affidavit that the police abused him and his long-term partner. On one occasion in 2015, the police apprehended them while they were dining at a restaurant, took them to a nearby field, lashed each of them 20 times with a cane, and threatened to arrest them if caught together again. Later that year, the police arrested Oppong, held him in a cell overnight, and beat him with a weapon made from a horse's tail. Oppong further attested that the police chased him and his friends on at least five other occasions.

Oppong also provided more information about the stabbing incident in 2018, which he had discussed in his CFI.  Specifically, he noted that he believed that the chief of his community organized a "Kill the Gays" group that attacked him.  The chief also empowered the police to discriminate against, and persecute, gay people in his community.  After the "Kill the Gays" group stabbed him, the doctor who treated him said he could not issue a medical report because he would likely be fired for helping a gay man.  Because Oppong believed neither the chief of his community, the police, nor his family would help him, he believed he had no choice but to flee the country following his release from the hospital.  Oppong flew from Ghana to Ecuador and travelled through seven other countries before arriving in the United States.  Oppong stated that he feared he would be killed if he returned to his Ghana, regardless of where he went in the country.

Oppong's testimony at his removal hearing largely tracked his affidavit: he testified that he was abused by a high school classmate, disowned by his mother (who also attempted to poison him), and ostracized by his community.  He also testified to his relationship with his long-term partner, their harassment and abuse by the police, and the 2018 attack by the "Kill the Gays" group.  He added that following the 2018 attack, he went to Accra, the capital of Ghana, but after receiving text messages that some people would find and kill him, he decided he was unsafe anywhere in the country and left.

6

The government's attorney asked Oppong why he testified to incidents he did not mention during his CFI.

> **Attorney:** You were asked [in the CFI] was [the 2018 stabbing] the only time you were physically harmed.  And you replied yes.  That, that was true?
> **Oppong:** That—I thought he was asking about how I was stabbed.
> . . .
> **Attorney:** The immigration officer asked did you ever have problems with anyone in your community before . . . And you replied no, never in my life . . . [a]nd that was the truth?
> **Oppong:** Yes, that was the truth.
> **Attorney:** So, before you were encountered by private individuals at that restaurant you had never had any problems before with anyone in the community.
> **Oppong:** No.
> . . .
> **Attorney:** You never once mentioned to Immigration officers about any prior incident regarding police. Or you, you never mentioned to Immigration officers any incidents regarding the police.  Did you?
> **Oppong:** So, my questions to them – no.  My questions to them was what, what they asked me is what I, I answered them.
> **Attorney:** The Immigration officers asked you what dates you were attacked.  The only date that you provided them was October 2[,] 2018.  Correct?
> **Oppong:** Yes.
> **Attorney:** You never once mentioned any incident with the police. Correct?
> **Oppong:** No.
> **Attorney:** In fact, the incident with the police never came up in your sworn statement either.  You never mentioned it to the Immigration officers at any point.  Correct?
> **Oppong:** Yes.

With regard to the 2018 attack, specifically, Oppong testified that the "Kill the Gays" group had harassed him on prior occasions.  The government's attorney asked him why he had not mentioned that fact to the immigration officers before.

7

Oppong replied: "I didn't know [that] I should come out with all this until I . . . contacted a lawyer, getting to know what is [meant] by asylum, that I have to tell my whole story."

The IJ interrupted direct and cross examination multiple times to inform Oppong that he was not being responsive to the questions asked of him. At one point, it became apparent that Oppong was looking at a piece of paper during questioning. Oppong's attorney explained that he had printed his questions to assist Oppong, and the IJ reminded Oppong to testify from personal experience.

Next, Oppong called Dr. Kathleen O'Mara as an expert witness on country conditions for gay men in Ghana. She testified that homosexuality is a crime in Ghana and the police regularly extort gay people. Based on Oppong's testimony and affidavit, she stated that she believed that Oppong's community, particularly the group that had attacked him, would find Oppong and "finish the job" if he returned to Ghana. She continued that, because family and community status dictated living conditions all over the country, Oppong would not be able to relocate safely anywhere in Ghana. On cross-examination, Dr. O'Mara admitted that she had only had one brief conversation with Oppong. In addition to this testimony, Oppong submitted Dr. O'Mara's expert affidavit (which largely mirrored her testimony), pictures of his scars from the 2018 stabbing, the United States Department of State's 2019 Country Report on Human Rights Practices in

8

Ghana, and various other reports and articles concerning the violence and discrimination against gay men in Ghana.

The IJ denied Oppong's asylum application. Critically, the IJ found Oppong not credible—for two reasons. The IJ first pointed out that in his CFI, Oppong "clearly and unequivocally testified that the one time that he was physically harmed was when he was stabbed" in 2018. Thus, the IJ found Oppong's new testimony concerning the attempted poisoning, abuse by his father, and abuse by the police to be "major, major inconsistencies." Second, the IJ found that Oppong "preferred to resort to testimony that he thought was consistent with his sworn affidavit rather than answering specific questions on a number of occasions." And because Dr. O'Mara's testimony was based entirely on one interview with Oppong and his own affidavit, and because Oppong provided no evidence to support his claims for relief other than his own testimony, the IJ found "absolutely no corroboration," which was fatal to his claims for relief.

Oppong appealed to the BIA. The BIA affirmed the IJ's decision with respect to the credibility finding and also agreed with the IJ's determination that Oppong failed to provide sufficient corroborating evidence for his claim, noting that he did not submit any evidence concerning his particular experience. The BIA further held that the IJ's findings on credibility and corroborating evidence

9

supported its denial of the asylum and withholding of removal claims, as well as its denial of CAT relief.  Oppong timely filed a petition for review with this Court.

## II.

We review only the decision of the BIA, except to the extent that the BIA expressly adopts or explicitly agrees with the IJ's opinion.  *Lukaj v. U.S. Att'y Gen.*, 953 F.3d 1305, 1311 (11th Cir. 2020).  We review the IJ's opinion to the extent that the BIA has found that the IJ's reasons were supported by the record, and we review the BIA's decision with regard to those matters on which it rendered its own opinion and reasoning.  *See Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011).

We review credibility determinations under the substantial-evidence test. *Xiu Ying Wu v. U.S. Att'y Gen.*, 712 F.3d 486, 493 (11th Cir. 2013).  Under this test, we must affirm the BIA's decision if, viewing the record in the light most favorable to its decision, it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Lopez v. U.S. Att'y Gen.*, 914 F.3d 1292, 1297 (11th Cir. 2019) (quoting *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015)).

## III.

Before we turn to Oppong's arguments before this Court, we begin with a brief overview of asylum, withholding of removal, and CAT claims.  To qualify

for asylum under the INA, the alien must prove that he was either persecuted in the past, or has a well-founded fear that he will be persecuted in the future "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i); *see Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006). This Court and the BIA have both recognized people who are gay as a "particular social group" under the INA. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 949 (11th Cir. 2010).

Similarly, to qualify for withholding of removal, the alien must show that, if returned to his country, it is more likely than not that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b); *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 819 (11th Cir. 2004). Because the standard for withholding of removal is higher, if a petitioner is unable to meet the standard of proof for asylum, he cannot meet the more stringent standard for withholding of removal. *D-Muhumed*, 388 F.3d at 819.

Finally, an applicant seeking protection under CAT must establish that it is more likely than not that he would be tortured if removed to the proposed country of removal. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004).

A. Asylum

11

Oppong challenges the BIA's rejection of his asylum claim on two grounds. First, he argues that the BIA and IJ erred in not finding him credible because substantial evidence in the record does not support that conclusion. Second, he argues that the BIA erred in concluding that he failed to submit sufficient corroborating evidence to support his asylum claim. Neither challenge succeeds.

1. Credibility

An applicant for asylum must establish eligibility for asylum by offering "credible, direct, and specific evidence in the record." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005) (quoting *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997)); *see also Al Najjar v. Aschcroft*, 257 F.3d 1262, 1287 (11th Cir. 2001) (to qualify for asylum, the alien must present "specific detailed facts," indicated that he was persecuted, or will be "singled out" for persecution) (quotations omitted)). Credibility is key. An applicant's credible testimony, standing on its own, is sufficient to establish eligibility for asylum. *Forgue*, 401 F.3d at 1287. On the other hand, an adverse credibility determination may itself be sufficient to support the denial of asylum. *Id.*

The BIA must offer specific, cogent reasons for an adverse credibility determination. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006). Once the BIA has offered specific and cogent reasons, "[t]he burden then shifts to the alien to show that the IJ's [or BIA's] credibility decision was not supported by

12

specific, cogent reasons or was not based on substantial evidence." *Id.* (quoting *Forgue*, 401 F.3d at 1287). Despite Oppong's arguments to the contrary, we conclude that substantial evidence supports the BIA's credibility determination.

Here, the BIA based the adverse credibility finding primarily on the inconsistencies between Oppong's sworn statements to the asylum officer in his CFI and his subsequent sworn statements in his asylum application and hearing. In his CFI, Oppong said that the only time he had been harmed was the 2018 stabbing. Specifically, the asylum officer asked him, "Was that [stabbing] the only incident of physical harm," and Oppong responded, "[Y]es[.] I was stabbed in the stomach." But during his asylum proceedings, Oppong described numerous incidents where he was physically harmed, including two arrests and beatings by the police in 2015 and an attempted poisoning by his mother in 2009. He further testified that the police had chased him five other occasions. As the IJ put it, these are "major, major, inconsistencies."

Inconsistencies and omissions between a CFI and an applicant's later testimony can support an adverse credibility determination. In *Shkambi v. United States Attorney General*, for example, we held that an adverse credibility determination was supported by substantial evidence where the asylum applicant described only one incident of harm during his airport and interview and CFI, but described three such incidents during asylum proceedings. 584 F.3d 1041,

13

1043–46, 1049 (11th Cir. 2009).  We observed that the applicant's prior "interview statement was not merely a less detailed version of the facts he gave in later statements" because the applicant "omitted entire incidents and other significant facts" during the initial interviews and "directly contradicted" some of his earlier statements during his hearing testimony.  *Id.* at 1051.  Just as in *Shkambi*, Oppong described only one incident of harm during his CFI, the 2018 attack—even after he was specifically asked whether there were any additional incidents—but later testified that he was harmed on numerous occasions.  Moreover, we have held that an internal inconsistency coupled with an omission from an earlier interview may justify an adverse credibility finding.  *See Xia v. U.S. Att'y Gen.*, 608 F.3d 1233, 1240 (11th Cir. 2010).   Oppong's numerous inconsistencies and omissions support the BIA's adverse credibility determination here.

Oppong attempts to escape this inevitable conclusion by arguing that the differing statements between his CFI and testimony are not inconsistencies because he did not contradict any information in his CFI.  Rather, as Oppong tells it, during his asylum proceedings he "elaborated" on what he had told the immigration officer during the CFI.  Not so.  It is true that in *Tang v. United States Attorney General,* we recognized that an "IJ should not focus exclusively on airport interview omissions, rather than contradictions, when determining whether an alien is credible."  578 F.3d 1270, 1279 (11th Cir. 2009).  But we subsequently clarified

14

in *Shkambi* that substantial evidence supports an adverse credibility finding where the applicant "omitted entire incidents and other significant facts" during his airport interview and CFI and also "directly contradicted" his airport and CFI interview in hearing testimony. 584 F.3d at 1051. Oppong squarely falls in the *Shkambi* camp: he left out numerous incidents of harm, including harm by the police, which is significant to the asylum analysis. He also contradicted himself: when asked in his CFI whether the 2018 stabbing was the "only time" that he suffered physical harm, he replied that it was.[2] Further, when asked if he knew who attacked him in his CFI, he stated that he did not. Before the IJ, however, he testified that the "Kill the Gays" group attacked him. Therefore, this is not a case where his CFI was "merely a less detailed version of the facts," which he elaborated upon "in later statements." *Id.*

Oppong claims that despite giving clear reasons for the adverse credibility determination, the BIA failed to consider relevant factors in making that determination. When evaluating the "consistency between the applicant's . . . statements," the IJ and BIA must consider "the circumstances under which the statements were made." 8 U.S.C. § 1158(b)(1)(B)(iii); *see Tang*, 578 F.3d at 1278–79. Oppong argues we should overturn the BIA's credibility finding

---

[2] Nor do we find Oppong's explanation that he misunderstood the question convincing. In fact, he reiterated that the answer he gave at the CFI was true when asked about it during his cross examination at the asylum hearing.

15

because it did not consider two factors in determining that he was not credible. The first factor that Oppong points to is the effect of trauma on his CFI, *i.e.*, that he was intimidated by the asylum officer conducting the interview, given his negative experience with police in Ghana. The problem is that Oppong did not exhaust this argument before the BIA. And we lack jurisdiction to review unexhausted arguments. 8 U.S.C. § 1252(d)(1); *Lukaj*, 953 F.3d at 1313. To exhaust a claim, the applicant must raise the core issue before the BIA and set out any discrete arguments he relies on in support of that claim, in order to give the agency a full opportunity to consider his claim and compile a record that will be adequate for future judicial review. *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016). Oppong did not identify this core issue or any discrete arguments as to how his trauma affected his CFI during his appeal to the BIA, so we may not consider this unexhausted argument. *See Jeune*, 810 F.3d at 800.

We do have jurisdiction to consider Oppong's second argument: that the general nature of the CFI, which does not afford the alien the same due process as a full hearing, explains any inconsistencies between Oppong's CFI and his subsequent statements. To advance this argument, Oppong points out that this Court has held that IJ's should consider the context of the preliminary interviews, such as CFIs, when making an adverse credibility finding. *See Tang*, 578 F.3d at 1279. In *Tang*, we held:

16

> [W]hen considering whether later testimony qualifies as a
> contradiction, as opposed to an elaboration, of an applicant's *airport
> interview statements*, an IJ should note that during *an airport
> interview*, unlike in a hearing with full due process accorded, the alien
> is not represented by counsel and may be markedly intimidated by
> official questioning, particularly if the alien has indeed been subject to
> government abuse in her country of origin.

*Id.* (emphasis added).  The IJ's credibility finding in *Tang* was based on the

applicant's elaborations upon his interview statement rather than direct

contradictions and glaring omissions.  *Id.* at 1279–80, 1281.  But, as we have stated

above, Oppong not only initially omitted numerous events where he was allegedly

harmed, he also later directly contradicted himself.   Moreover, *Tang* dealt with an

airport interview, while here the credibility determination depends on Oppong's

CFI.  Oppong does not identify any authority recognizing that the considerations

that apply to credibility determinations based on *airport interviews* apply with

equal force to those based on *CFIs*.[3]

Finally, Oppong asserts that the BIA's credibility determination was in error

because it did not consider his explanation for the discrepancies between his CFI

---

[3] Airport interviews and CFIs are different types of interviews that occur at different points in the asylum process.  When an alien arrives at an airport (or border) without entry documents, an immigration officer conducts a screening interview to determine whether the alien is inadmissible and therefore subject to expedited removal procedures.  *See* 8 U.S.C. § 1225(b)(1)(A).  If the immigration officer determines that the alien is subject to expedited removal, then the officer must order the alien removed unless the alien indicates an intention to apply for asylum or a fear of persecution  *Id.* § 1225(b)(1)(A)(i).  In that event, the officer must refer the alien for a CFI, which is conducted by an asylum officer.  *Id.* § 1225(b)(1)(A)(ii).  If the asylum officer determines that the alien has a credible fear of persecution, then the alien is detained for further consideration of his asylum application.  *Id.* § 1225(b)(1)(B)(ii).

and hearing testimony.  Oppong's explanation is that he believed the asylum officer was asking only about his immediate reason for leaving Ghana, *i.e.*, the 2018 stabbing.  The record shows, however, that the BIA considered and rejected this explanation, and it supports the BIA's interpretation of Oppong's answer.  Oppong also provided no explanation for his other inconsistency: namely, his ability to identify the attackers in 2018.  In sum, substantial evidence supports the BIA's adverse credibility determination.

   2. Corroborating Evidence

   The BIA also did not err in concluding that Oppong failed to present sufficient corroborating evidence.  Where the IJ "determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence."  8 U.S.C. § 1158(b)(1)(B)(ii).  "[I]f the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal to his asylum application."  *Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1347 (11th Cir. 2008) (quoting *Sidhu v. INS*, 220 F.3d 1085, 1090 (9th Cir. 2000)).  The BIA held that Oppong's failure to corroborate was fatal to his claims.  In his petition to this Court, Oppong argues that despite the requirement that it consider "all evidence introduced by the applicant," *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1351

18

(11th Cir. 2009), the BIA did not consider the evidence he presented to corroborate his claims and improperly required him to obtain evidence that was not reasonably available. We disagree.

Consider the evidence Oppong presented to corroborate his asylum claim. First, Oppong submitted pictures of his stab wound. These pictures confirm he was stabbed, but they do not corroborate Oppong's testimony as to *how* and *why* that stabbing occurred. Second, Dr. O'Mara's expert testimony does not serve as corroboration because it relates to the general conditions for gay men in Ghana, not Oppong's own experiences that would demonstrate he would be a potential target. For a similar reason, the reports and articles concerning the treatment of gay men in Ghana do not relate to Oppong's experiences. In sum, although Oppong submitted evidence showing that gay men are often harassed and mistreated in Ghana, he did not submit any direct evidence corroborating his claim that he specifically was persecuted or faced an individualized fear of persecution upon his return because he was gay. *See Forgue*, 401 F.3d at 1287; *Al Najjar*, 257 F.3d at 1287. Moreover, the record clearly shows that the BIA considered this evidence and explicitly rejected it as insufficient to meet his burden. *See Malu v. U.S. Att'y Gen.*, 764 F.3d 1282, 1293 (11th Cir. 2014) (the BIA "need not address specifically . . . each piece of evidence the petitioner presented") (quoting *Carizzo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1332 (11th Cir. 2011)).

19

Oppong relatedly claims the BIA erred in requiring him to submit other forms of corroborating evidence, such as police reports or letters from people in Ghana who were aware of his experiences, without acknowledging that such evidence was not reasonably available. The BIA precedent on which he relies holds that *if an applicant is found credible*, his testimony may suffice if other corroborating evidence is not reasonably available. *See In re S-M-J-*, 21 I.&N. Dec. 722, 724, 731 (1997). But unlike that case, Oppong was found not credible, and therefore the lack of corroborating evidence—no matter its availability—can doom his claim. *See Forgue*, 401 F.3d at 1287. We therefore conclude that substantial evidence supports the BIA's specific and cogent reasons why the evidence Oppong offered was neither "direct" nor "specific" to his case, and thus insufficient to support his claim in the absence of credible testimony. *See id.* Accordingly, the BIA did not err in denying Oppong's claim for asylum.

B. Withholding of Removal and CAT Relief

Finally, because Oppong has failed to establish a claim of asylum on the merits, and all three of his claims rely upon the same evidence, he necessarily fails to establish eligibility for withholding of removal or protection under CAT.[4] *Forgue*, 401 F.3d at 1288 n.4; *Al Najjar*, 257 F.3d at 1292–93.

---

[4] Similar to his challenge to his asylum claim, Oppong specifically argues that the BIA erred in denying his withholding and removal claims because it ignored his corroborating evidence, which he asserts establishes those claims. But the corroborating evidence he points to

**PETITION DENIED.**

_____

is the same evidence that he presented in support of his asylum claim: the expert testimony and reports showing that gay men in Ghana generally face serious harassment and state-condoned violence. And the BIA's reasons for rejecting that evidence as insufficient to establish Oppong's asylum claim in light of his discredited testimony—because it did not show Oppong was specifically harmed or faced individual harm (including torture) upon his return—applies equally to his remaining two claims for relief. *See Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1324 (11th Cir. 2007) (the applicant must show evidence that amounts to a specific, individual threat of torture, not merely an "attack on the general state of affairs." (quoting *Lavira v. Att'y Gen.*, 478 F.3d 158, 164 (3d Cir.2007)); *Ruiz*, 440 F.3d at 1259 (country report showing generalized violence was insufficient to support statutory eligibility for either asylum or withholding of removal).

Moreover, contrary to Oppong's repeated suggestions, the BIA did not need to list every piece of evidence that Oppong submitted. *See Malu*, 764 F.3d at 1293. The record makes clear that it considered his evidence—and even individually addressed some of the reports— and that is sufficient.

21