[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 7, 2009
THOMAS K. KAHN
CLERK

_____

No. 09-10493
Non-Argument Calendar

_____

Agency No. A79-448-138

EMILIAN SHKAMBI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(October 7, 2009)

Before HULL, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Emilian Shkambi, a native and citizen of Albania, seeks review of the Board

of Immigration Appeals' ("BIA") decision affirming the Immigration Judge's ("IJ") order denying him asylum and withholding of removal under the Immigration and Nationality Act ("INA") and relief under the United Nations Convention Against Torture ("CAT"). Shkambi claims he suffered persecution in Albania because of his political opinion. In denying relief, the IJ found Shkambi not credible. After review, we deny the petition.

## I. BACKGROUND

### A. Airport Interview

On May 30, 2002, Shkambi attempted to enter the United States at Miami International Airport. During the airport interview with an immigration officer and an Albanian interpreter, Shkambi stated that he had attempted to enter the United States to find a job because there was no employment in Albania. Shkambia also stated that the Albanian police "make their own rules" and could do anything to him. However, Shkambia indicated that he had never been arrested.

On June 5, 2002, the Department of Homeland Security served Shkambi with a notice to appear charging him with removability under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an immigrant who, at the time of application for admission, did not possess a valid immigrant visa, reentry permit, border crossing card, or other valid entry document.

### B. Credible-fear Interview

2

On June 5, 2002, an asylum officer conducted a credible-fear interview with Shkambi using an Albanian interpreter. At the outset, the asylum officer informed Shkambi that he should feel comfortable disclosing the reasons he feared returning to Albania because these reasons would not be disclosed to the Albanian government and were important in determining whether Shkambi was eligible for asylum or withholding of removal.

During his credible-fear interview, Shkambi reported one incident of persecution. Shkambi stated that he had been a supporter of the Democratic Party ("DP") and had attended DP meetings on two occasions. In June 2000, while attending a DP party meeting, two police officers beat him with a baton and a broken bottle. When asked whether the officers said anything while they beat him, Shkambi responded, "[t]hey were just telling every body to leave the meeting." As a result of the attack, Shkambi's arm was injured and he was hospitalized for two months. Shkambi believed the officers targeted him because he had attended a DP gathering, and he explained that the police supported the Socialist Party ("SP").

When asked whether he had any further problems after this June 2000 incident, Shkambi responded that his uncle was sent to prison twice because he was a Catholic priest. Shkambi did not relate any other incidents involving himself. Shkambi stated that he left Albania due to his problems with authorities and that he feared they would imprison or kill him if he returned to Albania

3

because of his support for the DP.

## C.    Asylum Application

In March 2003, Shkambi filed an application for asylum, withholding of removal and CAT relief. In his application, Shkambi asserted that he was persecuted based on his political opinion, religion, and membership in a particular social group.[1] In particular, Shkambi asserted that he, his father and his uncles were arrested, imprisoned, interrogated, beaten and tortured by the police and government authorities. Shkambi explained that the authorities were affiliated with the SP and that he, his father and uncles suffered this persecution due to their political activity with the DP.

In an attached personal statement, Shkambi explained that his father and uncles were leaders in the DP. Shkambi became involved with the DP's Youth Forum in 1998 and assisted his father in organizing DP meetings and demonstrations. The personal statement outlined three incidents of alleged persecution of Shkambi.[2] First, in September 1998, after a DP leader, Arben Brozi,

---

[1]On appeal, Shkambi asserts only that he was persecuted on account of his political opinion. Thus, we do not discuss further Shkambi's claims of persecution based on religion or membership in a social group. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (stating that claims not briefed on appeal are deemed abandoned).

[2]The personal statement recounted several incidents prior to 1998 in which Shkambi's father and uncles were beaten or arrested by police while participating in political demonstrations. The personal statement also stated that in 1999 one of Shkambi's uncles, who was a DP party leader, was arrested and held for one month, during which time he was interrogated, beaten and tortured.

was murdered, Shkambi's father recruited people to join a protest at Brozi's funeral procession. At the protest, the police beat Shkambi and his father, and arrested his father.

Second, on August 11, 1999, three policemen attacked Shkambi. During the attack, one of the policemen cut his arm with a broken glass bottle and told him that his father must not have "learned a lesson," because he had permitted his son (Shkambi) to participate in politics. During the attack, the policemen demanded that Shkambi give information about his father and uncles and threatened to leave him to die so his father would stop his political activity. As a result of this incident, Shkambi was hospitalized for five days.

Finally, in September 2000, Shkambi and his father were returning home from a DP meeting when they were confronted by five policemen. The police arrested them, detained them for two weeks and brutally beat them. The police deprived Shkambi of food and water for two days, interrogated him, kicked him in his genitals, issued electric shocks to his body, and threatened to kill him. It took Shkambi several weeks to recover from this mistreatment.

In September 2000, the police released Shkambi and his father with orders to return with information about the DP. Instead, Shkambi traveled to a village in northern Albania, where he stayed until he made arrangements to leave the country in May 2002. Shkambi later learned that, when he and his father failed to report

5

back to police as ordered, the police issued a warrant for Shkambi's arrest and re-arrested his father. The police imprisoned Shkambi's father for approximately one month, and his father moved around between different cousins' houses in northern Albania after his release. After Shkambi's arrival in the United States, his uncle informed him that the police had been searching for him and his father.

## C.    Documentary Evidence

In support of his application, Shkambi filed a copy of a medical record indicating that Shkambi was hospitalized for "[m]any open injuries and bleeding to his arm" between August 11, 1999 and August 16, 1999.

Shkambi also included reports and articles on Albania. According to the 2001 U.S. State Department Country Report on Human Rights Practices in Albania ("2001 Country Report"), the Albanian police committed human rights abuses, including torture and other mistreatment of detainees. The DP had alleged that the police killed a DP member while he was in custody and reported that the police harassed and beat some of its members. The 2001 Country Report further stated that, while Albanian law provided for the right to peaceful assembly, some individuals claimed that the police intimidated them due to their participation in opposition rallies.

A 2001 article by Human Rights Watch stated that Albania's SP and DP engaged in "bitter political feuding." The article reported that a senior DP member

was assassinated in 1998. A 2001 report by Amnesty International stated that, in November 2000, the Albanian police arrested and mistreated DP demonstrators who lacked official authorization for their demonstration.

The record also included the 2003 U.S. State Department Country Report on Human Rights Practices in Albania, which largely was consistent with the 2001 Country Report, except that it did not mention abuse or harassment of DP members.

In addition, the record included a 2001 report by the State Department's Bureau of Democracy, Human Rights, and Labor. According to this 2001 report, Albania was under communist reign between 1945 and 1990, and a political persecution claim was likely to lack merit after this time period. The 2001 report stated that crime occurred at high levels, but that it was unlikely that individuals would be targeted for mistreatment on political grounds. Instead, because the Albanian economy was in poor condition, the majority of asylum claims by Albanian applicants were based on economic, rather than political, considerations.

### D.    Removal Hearing

At the removal hearing, Shkambi testified that his father was a member of the DP and attended DP rallies. Shkambi joined the DP's Youth Forum in 1998, attended rallies with his father and distributed DP literature. Due to his political activities, Shkambi had trouble with the police on three dates – September 14,

1998, August 11, 1999, and September 9, 2000. September 14, 1998 was the day of the funeral for an assassinated DP leader. On this day, the police beat Shkambi, his father and his uncles and arrested his father. His father was brutally beaten during his arrest, and, as a result, was hospitalized for five days.

On August 11, 1999, Shkambi was attacked by three policemen while on his way home from a DP Youth Forum meeting. During this attack, one of the officers cut Shkambi's left arm with a broken bottle. Shkambi stated that he was hospitalized for five days due to loss of blood from the cuts on his arm.

On September 9, 2000, five policemen arrested Shkambi and his father as they walked home from a DP meeting. Once at the police station, the policemen separated and interrogated Shkambi and his father and asked Shkambi about his father's and uncles' political activities. They threatened to kill Shkambi's father in front of Shkambi if he did not agree to provide them with information about his family's political activities. The police beat Shkambi, left him in a cell for two days without food or water, and then resumed interrogating him. The police also beat Shkambi in front of his father. During this beating, one of the officers hit Shkambi's genitals with a metal object, causing him to pass out from the pain. When Shkambi regained consciousness, the officers gave him an electric shock by placing metal plates on his shoulders. Shkambi's September 2000 confinement lasted for two weeks. During this time, the police also beat his father and

8

threatened to kill Shkambi in front of his father.

According to Shkambi, after the police released him and his father in September 2000, a friend who was also in the DP recommended they leave their home to avoid being killed.  Shkambi and his father traveled to a cousin's home, and Shkambi later fled Albania in May 2002.  Upon arriving in the United States, Shkambi learned that his father had again been arrested and beaten.

On cross-examination, Shkambi testified that he attended school until 1995.  After he left school, he did not work, but instead participated in political activities because his father told him that this was the most valuable use of his time.  Shkambi's father was employed as a truck driver and was the vice leader of the DP in the area where his family lived.  When asked why he did not tell the asylum officer at his credible-fear interview about his two-week detention in 2000, Shkambi responded that his fear of being returned to Albania caused him to forget about the incident.  When asked why Shkambi told the asylum officer that he was hospitalized for two months after the attack on August 11, 1999, Shkambi stated that he was hospitalized for five days and that he did not recall telling the asylum officer that his hospitalization lasted two months.  Shkambi explained that he did not mention his past persecution during his airport interview because he was too afraid to be able to share his entire story with the immigration officer.  On redirect examination, Shkambi clarified that, during his airport interview, he told the

9

immigration officer that he was afraid to return to Albania because the police made their own rules.

## E. IJ and BIA Rulings

The IJ denied all relief, finding that Shkambi was not credible because he had not been consistent in describing the severity of his mistreatment in Albania. The IJ pointed out that: (1) the extent of Shkambi's reported political involvement increased from nothing at his airport interview, to attending two DP meetings at his credible-fear hearing, to being an active member of the DP Youth Group and the son of a DP party leader in his asylum application and hearing testimony; and (2) Shkambi did not disclose his (or his father's) September 2000 arrest and torture, the most severe mistreatment he claims to have suffered, until he filed his asylum application. The IJ acknowledged that Shkambi's explanation for not disclosing these facts earlier was his fear of being returned to Albania. However, the IJ found this explanation unconvincing, stating:

> The Court fails to see why an individual will diminish the weight of his claim by indicating that if he disclosed more, he would then be returned to the home country when the opposite is what's logical. The higher the level of harm, the less the chances are that the person may be returned on the spot. The less a person discloses as far as the level of harm, the higher the chances are that an individual may be returned to the home country because they do not meet that even of [sic] prima facie case of being paroled to this country for [the] purpose of a credible fear interview, much less a full asylum hearing before the Immigration Court. That type of rational[e] is not logical. It does not make sense. That is the explanation that the Respondent

10

has given the Court.  That he may have been nervous, the Court understands and accepts.  But that he did not even remember as he told the Court here today, that is not consistent with how a reasonable person, when disclosing, once they have been given the opportunity to do so, all the reasons as to why they're seeking political asylum and all the level of harm that may have occurred to them.  The Court fails to see why the Respondent would have disclosed what appears to be a minor incident with the police in which apparently he's beaten and his arm is injured by a broken bottle, and does not tell the asylum officer that he in fact was beaten severely to the point that he's injured or at least had a blow to his genitals, much less that he is being electrocuted by metal plates that are being placed on his shoulders.  It does not make sense.

After noting that Shkambi's asylum application recounted a September 9, 2000 arrest in which he claims to have been brutally tortured, beaten and interrogated, the IJ stated: "The Court can allow for some leeway as far as the level of detail in an asylum hearing or even in a formal, written application for political asylum.  But when a story or a claim increases to the level that this particular claim has increased, then the Court then does have issues with an individual's credibility."

The IJ credited Shkambi's claim that "some sort of confrontation with the police" occurred on August 11, 1999.  However, the IJ found that, even assuming this single confrontation was politically motivated, it did not rise to the level of persecution.  The IJ also discredited Shkambi's testimony as to the extent of his and his father's political activities.  Noting that in Albania Shkambi was unemployed and poor, the IJ found it "very difficult to believe that the Respondent

11

would then otherwise engage his available time in politics as opposed to worrying about what normal human beings worry about day [in] and day out, that is, about eating and putting a roof over one's head, first and foremost." The IJ also noted that, although conditions in Albania suggested a "political tug-of-war" between the DP and the SP, given Shkambi's "minimal level of [political] activities," Shkambi had not shown he would be targeted in Albania. Finally, the IJ found that Shkambi had successfully relocated in Albania, where he remained unharmed for a year-and-a-half (from September 2000 to May 2002). Thus, the IJ concluded that Shkambi had failed to show he had suffered past persecution or had a well-founded fear of future persecution.

On appeal to the BIA, Shkambi challenged, <u>inter alia</u>, the IJ's adverse credibility finding, arguing that the IJ relied on minor flaws and irregularities to discredit him and failed to take into account that the fear Shkambi felt while being interviewed by immigration officials caused him not to fully disclose all the details of his persecution. The BIA adopted and affirmed the IJ's decision to deny Shkambi's requests for asylum and withholding of removal to the extent it was based on the adverse credibility finding.[3] The BIA reviewed the IJ's reasons for

---

[3]Shkambi did not challenge the denial of his request for CAT relief before the BIA and does not challenge it on appeal to this Court. Thus, we do not address Shkambi's claim for CAT relief. See <u>Amaya-Artunduaga v. U.S. Att'y Gen.</u>, 463 F.3d 1247, 1250 (11th Cir. 2006) (stating that we lack jurisdiction to consider claims that were not exhausted before the BIA); <u>Sepulveda</u>, 401 F.3d at 1228 n.2 (stating that claims not briefed on appeal are deemed abandoned).

12

the adverse credibility finding, noting that in his airport interview Shkambi omitted any mention of his past persecution at the hands of the Albanian police and that in his credible-fear interview he mentioned only the beating where he sustained an injury to his arm. In contrast, the BIA pointed out that Shkambi mentioned for the first time in his hearing testimony that he had trouble with the police in 1998 and September 2000 and failed to provide a plausible explanation for omitting these incidents in his previous interviews. In addition, the BIA determined that Shkambi failed to explain why he told the asylum officer in his credible-fear interview that his arm was injured in June 2000 and required two months' hospitalization, but testified at the removal hearing that the injury occurred in August 1999 and required only five days' hospitalization. Thus, the BIA concluded that the IJ's adverse credibility determination was not clearly erroneous. Shkambi filed this petition for review.

## II. DISCUSSION

### A.    Meaningful Appellate Review

Shkambi argues that the BIA did not provide a reasoned basis for its decision because it failed to adequately address the IJ's adverse credibility finding, thus making meaningful judicial review impossible.

"Where . . . the [Immigration Judge] has given reasoned consideration to the petition, and made adequate findings, we will not require that it address

13

specifically each claim the petitioner made or each piece of evidence the petitioner presented." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1374 (11th Cir. 2006) (quotation marks omitted, alterations in original). Thus, it is sufficient if the IJ "consider[ed] the issues raised and announce[d] its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Id. (quotation marks omitted). With regard to credibility findings, the IJ must give "specific, cogent reasons" for discrediting an asylum applicant. Forgue v. U.S. Att'y Gen., 410 F.3d 1282, 1287 (11th Cir. 2005).

Where the BIA issues its own opinion, but expressly adopts the IJ's reasoning, we review both the BIA's and the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). Here, because the BIA expressly adopted the IJ's decision "to the extent it was based upon an adverse credibility finding," we review both the BIA's and the IJ's reasoning concerning the adverse credibility finding and its effect on Shkambi's claims.

In Shkambi's case, the BIA and the IJ gave specific, cogent reasons for finding Shkambi not credible and for concluding that he was ineligible for asylum and withholding of removal. In support of the adverse credibility finding, both the BIA and the IJ pointed to material omissions and inconsistencies among Shkambi's hearing testimony and his two previous statements to immigration officers. Furthermore, the IJ offered reasonable explanations for why she found Shkambi's

14

explanation for the omissions and inconsistencies implausible.[4] Contrary to

Shkambi's claims, there was nothing conclusory or summary about the BIA's

consideration of the IJ's adverse credibility finding. Instead, the BIA carefully

reviewed the omissions and inconsistencies highlighted by the IJ. This reasoned

discussion of Shkambi's credibility is sufficient to allow for meaningful appellate

review of that finding.[5]

## B.    Adverse Credibility Finding

Shkambi argues that the IJ's adverse credibility finding, adopted and

affirmed by the BIA, is not supported by substantial evidence.[6]

An asylum applicant has the burden to show, with specific and credible

evidence, either past persecution or a well-founded fear of future persecution on a

protected ground. Forgue, 401 F.3d at 1286-87. If the IJ finds an asylum applicant

not credible, the IJ must make an explicit adverse credibility finding and offer

---

[4]Shkambi argues for the first time in this Court that the IJ engaged in speculation in discrediting him. Because this claim was not exhausted before the BIA, we do not address it. See Amaya-Artunduaga, 463 F.3d at 1250.

[5]Shkambi argues that the IJ failed to "address the remainder of [his] eligibility for relief." However, the BIA did not adopt the IJ's decision as to statutory eligibility, and we do not review that portion of the IJ's decision. See Al Najjar, 257 F.3d at 1284. Shkambi does not make a similar argument as to the BIA's ruling. Instead, on appeal, Shkambi argues that his hearing testimony was wrongly discredited and that, when properly credited, establishes his eligibility for asylum and withholding of removal. Thus, we address only the IJ's and the BIA's adverse credibility finding.

[6]Credibility determinations are reviewed under the substantial evidence test, and we will not overturn them unless the record compels it. Forgue, 401 F.3d at 1286-87.

"specific, cogent reasons" for the finding. Id. "Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1255 (11th Cir. 2006).[7] "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." Forgue, 401 F.3d at 1287. "[T]his court may not substitute its judgment for that of the [IJ] with respect to credibility findings." Id. at 1286 (quotation marks omitted).

Here, the IJ and the BIA gave specific, cogent reasons for finding Shkambi not credible, and those reasons are supported by the record. Specifically, the IJ and the BIA both pointed out the material omissions and inconsistencies among Shkambi's airport interview, credible-fear interview, asylum application and hearing testimony. With regard to omissions: (1) in his airport interview, Shkambi failed to mention any incidents at all of persecution by the Albanian police, instead stating that he traveled to the United States to find employment; (2) in his airport

---

[7]The REAL ID Act of 2005 provides that an adverse credibility determination may be based on inconsistencies that do not go "to the heart of the applicant's claim." See Pub. L. No. 109-13, § 101(a)(3), (d)(4)(C), 119 Stat. 231, 303, 305 (codified at 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C). Because Shkambi's application was filed before these amendments became effective on May 11, 2005, they do not apply to his claims. Nonetheless, we need not resolve whether adverse credibility determinations in pre-REAL ID Act cases must be based on inconsistencies that go to the heart of the claim because the inconsistencies identified by the IJ and the BIA in this case relate directly to Shkambi's claims of persecution.

16

interview, he did not mention any political involvement; (3) in his credible-fear interview five days later, Shkambi mentioned only the beating he suffered in August 1999, omitting any mention of his 1998 arrest or the prolonged, two-week torture he later claimed to have suffered in 2000; and (4) in his credible-fear interview, he did not mention his membership in the DP's Youth Forum or his father's and uncles's leadership in the DP. In other words, Shkambi failed to mention any persecution in 1998 or 2000 or his family's leadership role in the DP until he filed his asylum application and testified at his hearing.

As for inconsistencies: (1) Shkambi stated during his credible-fear interview that his arm was injured in July 2000 and required a two-month hospitalization, but testified at the hearing that the injury occurred in August 1999 and required only a five-day hospitalization; and (2) Shkambi stated in his airport interview that he had never been arrested, but testified at the hearing that he was arrested in 2000 and tortured for two weeks.

Shkambi argues that he should not have been discredited based on omissions and inconsistencies in his airport and credible-fear interviews because he explained that they were a result of his fear of being returned to Albania. We recently addressed an IJ's use of a petitioner's airport interview in assessing credibility in Tang v. U.S. Att'y Gen., ___ F.3d ___, No. 08-12212, 2009 WL 2432054 (11th Cir. 2009). In Tang, the asylum applicant, Tang, stated in her airport interview that

17

she had traveled to the United States because she was Christian and there was no religious freedom in China. Id. at *2. When asked which church she attended, Tang responded that she did not go to a church, but to people's houses, and that it was "family style." Id. In her credible-fear interview, Tang said she was a member of an underground church and described multiple beatings and arrests. Id. Thus, while Tang did not mention any beatings or arrests in her airport interview, she did mention them in her credible-fear interview. At her removal hearing, Tang testified that she was a member of an underground family church and that the police raided her church, arrested her and accused her of belonging to a cult. Id. at *1. The police detained her for more than ten days and regularly beat and interrogated her. Id. After her parents paid bribes to obtain her release, she was re-arrested and beaten five times. Id.

The IJ discredited Tang, relying upon purported inconsistencies between Tang's airport interview and her later credible-fear interview and hearing testimony. Id. at *2. On appeal, this Court concluded that one inconsistency was easily explained by Tang during the hearing and another was not in fact an inconsistency, but an elaboration on a statement made during her airport interview. Id. at *5-6. We expressed some concern about, but did not reject outright, a third inconsistency, Tang's omission of multiple brutal police beatings during her airport interview. Id. at *8.

18

In reversing the credibility finding and remanding for a reevaluation of credibility,[8] we drew a distinction between hearing testimony that merely elaborates upon the earlier airport interview and hearing testimony that "actually contradicts" and "cannot be squared with" the airport interview. Id. at * 7, 8. We recognized that, in an airport interview, unlike an asylum hearing, "the alien is not represented by counsel and may be markedly intimidated by official questioning, particularly if the alien has indeed been subject to government abuse in her country of origin." Id. at *6. In so doing, we relied upon opinions from several sister circuits that have concluded that an airport interview may be used to evaluate credibility as long it is reliable. See, e.g., Ramsameachire v. Ashcroft, 357 F.3d 169, 179 (2d Cir. 2004); Balogun v. Ashcroft, 374 F.3d 492, 504-05 (7th Cir. 2004); Balasubramanrim v. INS, 143 F.3d 157, 163-64 (3d Cir. 1998).[9]

---

[8]In Tang, we rejected two of the IJ's stated reasons for discrediting Tang–speculation about the position and influence of Tang's mother and perceived inconsistencies about Tang's childhood religious experience. We expressed concern about two others–Tang's rehearsed demeanor during the hearing and her omission of the beatings and arrests during her airport interview. Although we did not reject these latter two reasons outright, we found them to be "strong factors pointing to a remand." Id. at *7-8. In addition, we concluded that the BIA had mistakenly found that medical records that documented Tang's treatment for two beatings were not timely filed and, thus, had not considered them. Id. at *8. In light of all these considerations, we concluded that it was appropriate to vacate the BIA's decision and remand for the BIA and the IJ "to reevaluate its decision in this case and its credibility determination in light of this opinion and in light of the medical records." Id.

[9]Here, Shkambi raises no argument as to the reliability or accuracy of the airport interview, except to argue that he was too afraid of being returned to Albania to be fully forthcoming during the interview. Notably, Shkambi's airport interview was conducted in Albanian with the use of an interpreter. Shkambi stated during the airport interview that he had understood all the questions he was asked and had answered them truthfully and voluntarily.

Consequently, in Tang we concluded that, although an IJ may consider contradictions between an asylum applicant's airport interview and his later testimony, "if an alien's statements during an airport interview are less detailed than the alien's later testimony, the IJ should not focus exclusively on airport interview omissions, rather than contradictions, when determining whether the alien is credible." Id. (emphasis added). Thus, Tang recognizes that airport interviews are useful and probative in evaluating an asylum applicant's credibility, but that they must be used with care as to the nature of the variances with subsequent statements.

In Shkambi's case, unlike in Tang, the IJ did not rely exclusively on omissions from Shkambi's airport interview to discredit him. Unlike in Tang, Shkambi's airport interview statement was not merely a less detailed version of the facts he gave in later statements. Rather, Shkambi omitted entire incidents and other significant facts both during his airport interview and again at his credible-fear interview. And, during his hearing testimony, Shkambi directly contradicted his airport interview statement that he had never been arrested.

Although Shkambi offered his fear as an explanation for these omissions and inconsistencies, that explanation does not compel a conclusion that Shkambi was credible. See Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1233 (11th Cir. 2006) (concluding that, although asylum applicant offered tenable explanation for

20

inconsistencies, the explanation did not compel reversal of the IJ's adverse credibility determination). This is especially true here because the asylum officer at his credible-fear interview assured Shkambi (in his native language through an interpreter) that he should feel comfortable telling him the reasons he feared returning because they would not be disclosed to the Albanian government and they were important to his asylum application. After receiving these assurances, Shkambi recounted only one incident, a June 2000 encounter with two policemen during which his arm was injured. When Shkambi was pointedly asked about additional problems after this encounter, Shkambi stated only that his uncle had been imprisoned for being a Catholic priest. Shkambi did not mention the most severe allegations of mistreatment found in his asylum application and hearing testimony. Cf. Tang, 2009 WL 2432054, at *8 (expressing concern about relying on Tang's omission of police beatings in her airport interview because Tang was not asked about past harm, only about her fear of future harm). Shkambi also did not mention his father's or uncles' leadership in the DP and the abuse he later claimed they suffered at the hands of the police. As the IJ and BIA noted, the extent of Shkambi's political involvement and the severity of the abuse he suffered as a result increased dramatically with each retelling of his story. This is not the kind of "helpful elaboration" found in Tang. Cf. id. at *7 (describing Tang's later statement that she did not consider her grandmother's Catholic religion to be a

21

Christian religion to be an "helpful elaboration" because it explained why Tang's statement in her airport interview that she had not practiced Christianity before becoming a member of the underground family church was not inconsistent with her hearing testimony that as a child she attended the Catholic church with her grandmother).

For all these reasons, substantial evidence supports the IJ's adverse credibility finding. Furthermore, Shkambi does not argue that the documentary evidence in the record compels a conclusion that he was persecuted or has a well-founded fear of persecution. Because Shkambi failed to establish eligibility for asylum, he likewise failed to establish eligibility for withholding of removal. See Al Najjar, 257 F.3d at 1292-93.

**PETITION DENIED.**