[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14404
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 25, 2011
JOHN LEY
CLERK

Agency No. A095-890-849

PIERRE KAMAL EL HAJJ,
JOCELYNE NAJI NADDAF EL HAJJ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 25, 2011)

Before HULL, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Pierre Kamal El Hajj and Jocelyne Naji Naddaf El Hajj, his wife, who are both natives and citizens of Lebanon, petition for review of the Board of Immigration Appeals' ("BIA") decision denying their application for asylum. Based on contradictions in his testimony at a hearing before an immigration judge ("IJ"), the IJ found that El Hajj was not credible, and denied his application. The BIA, in a separate opinion, concurred, identifying several contradictions that supported the adverse credibility finding, and also determined that El Hajj's documentary evidence was insufficient to overcome his incredible testimony. In this petition, El Hajj argues that: (1) substantial evidence did not support the BIA's adverse credibility determination because any inconsistencies between the application, credible-fear interview, and hearing testimony related only to minor details and were adequately explained as errors by the application preparer and El Hajj's repression of traumatic events; and (2) the asylum officer's referral assessment from the credible-fear interview was improper impeachment evidence because the asylum officer was not called to testify at the hearing. After thorough review, we deny the petition.

We review the BIA's credibility findings under the "highly deferential" substantial evidence test, which requires that we uphold the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record

2

considered as a whole." Forgue v. United States Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation omitted). Thus, we may reverse only when "the record compels it." Shkambi v. U.S. Att'y Gen., 584 F.3d 1041, 1049 n.6 (11th Cir. 2009).

When the BIA issues its own opinion, we review only the decision of the BIA, except to the extent that the BIA expressly adopts the IJ's decision or reasoning. Id. at 1048. Here, because the BIA did not explicitly adopt IJ's reasoning with respect to the IJ's credibility findings, we review only the BIA's decision.

An alien who is present in the United States may apply for asylum. 8 U.S.C. § 1158(a)(1). The government has the discretion to grant asylum if the alien establishes that he is a "refugee." Id. § 1158(b)(1). The Immigration and Nationality Act ("INA") defines a "refugee" as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). Thus, an applicant for asylum must establish either: (1) past persecution on account of a protected ground; or (2) a well-founded fear of future persecution on account of a protected ground. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230-31 (11th Cir. 2005).

3

A prerequisite to qualify for both asylum and withholding of removal is that the IJ must find that the applicant is credible. See Niftaliev v. U.S. Att'y Gen., 504 F.3d 1211, 1215 (11th Cir. 2007). An adverse credibility determination alone is sufficient to support the denial of an asylum application only if the applicant produces no evidence except for his testimony. Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1352 (11th Cir. 2008). By contrast, when an applicant produces corroborative evidence, "the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination." Forgue, 401 F.3d at 1287.

The BIA must offer "specific, cogent reasons" for an adverse credibility finding. Shkambi, 584 F.3d at 1049 (quotation omitted). "Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." Id. (quotation omitted). An adverse credibility determination also may be based on inconsistencies between hearing testimony and statements made at prior interviews, including credible-fear interviews with an asylum officer. See id. at 1049-51 (holding that the BIA properly made an adverse credibility determination based on contradictions between a credible-fear interview and the hearing testimony regarding the date and effect of an injury, and the failure to mention an entire incident involving torture at the credible-fear interview).

4

Once the IJ makes an adverse credibility finding, the alien bears the burden to show that the finding was not supported by the reasons provided or was not based on substantial evidence. Id. at 1049. Fear of returning to the country of origin will not be enough to explain inconsistencies between earlier and later statements or omissions of key facts. Id. at 1051. When an alien personally signs his asylum application, that signature "establishes a presumption that the applicant is aware of the contents of the application." 8 C.F.R. § 1208.3(c)(2).

Here, the BIA's supported its adverse credibility determination with specific, cogent reasons, see Shkambi, 584 F.3d at 1049 -- namely, that multiple inconsistencies between the statements in his application, his interview with the asylum officer, and his hearing testimony supported the IJ's adverse credibility finding. Indeed, numerous inconsistencies, including the length of time he was detained, the form of torture he was subjected to, and the cause of his wife's injuries, are reflected in the record. For example, El Hajj stated in his application that the 1997 detention lasted for two days; in his credible-fear interview, this detention lasted at least five days; and at his hearing, this detention lasted three days. Similarly, he stated in his application and at the hearing that he was released in 1997 after paying $5,000; but at his interview, stated that he was released upon paying $10,000. Also, he stated in his application that his wife's captors actively burned her and elaborated

5

in his interview that they used a flaming stick; but proffered at the hearing that she actually was injured by shrapnel during an explosion that occurred when she was captured. As opposed to merely supplementing his earlier account with additional information, these inconsistencies represented direct contradictions in El Hajj's story at various stages of his asylum proceedings. Cf. Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1280-81 (11th Cir. 2009) (recognizing a difference between elaborating on earlier testimony and testimony that "actually contradicts" the earlier testimony).

El Hajj's attempts to explain these inconsistencies were insufficient to meet his burden to show that substantial evidence did not support the BIA's adverse credibility finding. See Shkambi, 584 F.3d at 1049. As for his attempt to explain errors in his application as the preparer's fault, by signing the application, El Hajj accepted responsibility for its contents. See 8 C.F.R. § 1208.3(c)(2). Further, as discussed above, during his interview with the asylum officer, El Hajj volunteered his own version of events, but during the hearing -- months after he was put on notice of inconsistencies between his application and his interview -- he volunteered a version of events that was either consistent with the allegedly flawed application, but at odds with the interview, or at odds with both. To the extent that he suggests that there may have been problems with translation during the asylum interview, he admitted that he understood his friend's interpretation without any problems. As for his attempt to

6

explain the inconsistencies on the basis that he repressed details of his persecution, his inability to recall events precisely does not entitle him to a presumption of verity as to his overall persecution claim, especially where instead of qualifying his account or remaining silent on matters he could not accurately remember, he volunteered that he often relived his experiences and they traumatized him to the point of nightmares, yet offered contradictory versions of these experiences throughout the proceedings. See Shkambi, 584 F.3d at 1049-50.

In addition, El Hajj cites no authority for his argument that it was inappropriate to introduce the referral assessment without calling the asylum officer to testify. In any event, the referral assessment was accompanied by a transcript of the proceedings that fully supports the asylum officer's conclusions. Unlike an airport interview, El Hajj's credible fear interview occurred in the context of an affirmative application for asylum, during which he was accompanied by counsel and already had been in the United States over three years. As a result, the use of the referral assessment is akin to relying on credible-fear interviews, which we have allowed. See id. at 1049-51; see also Krasnopivtsev v. Ashcroft, 382 F.3d 832, 837-38 (8th Cir. 2004) (holding that the IJ properly could admit a referral assessment into evidence when determining an alien's eligibility for asylum).

7

Moreover, the BIA discharged its obligation to independently review El Hajj's voluminous documentary exhibits, and properly determined that they could not overcome his incredible testimony. See Forgue, 401 F.3d at 1287. The various earlier articles and country reports described in general terms the flight and eventual return following the end of the civil war of thousands of members of the Southern Lebanese Army ("SLA"), of which he allegedly was a member. However, while there were reports that SLA members were mistreated initially, they ultimately were tried and received relatively light punishments, and any harassment or abuse upon their release seems to have completely abated by 2006. The more recent articles and country reports that he later submitted discussed civil unrest in Lebanon, including a conflict between Hezbollah and Israel, but it occurred primarily in Beirut, far from his home village. There was no mention of measures directed against either former SLA members -- indeed, the most recent country report he submitted did not mention the SLA at all -- nor was there evidence to establish that El Hajj had been abused or that he even had served in the SLA personally. Although there was a document to corroborate the allegation that El Hajj's wife suffered a burn in her breast, it did not establish the cause of this burn. Lastly, throughout the period that this evidence covered, Lebanon permitted free religion, and tradition dictated that a Maronite Christian, El Hajj's religion, serve as its president. Because no other evidence

supported El Hajj's allegations of harm, or their origins, aside from his incredible testimony, his lack of corroboration was fatal to his application and the BIA was entitled to deny him relief based solely on its adverse credibility finding. <u>See</u> <u>Mohammed</u>, 547 F.3d at 1352.[1]

**PETITION FOR REVIEW DENIED.**

---

[1] Finally, because the BIA found El Hajj ineligible for asylum on the basis of the adverse credibility determination and the insufficiency of his corroborating evidence, we need not consider whether, if assumed credible, he could have established past or future persecution or a nexus to a protected ground, particularly where the BIA did not consider these issues in the first instance.