[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14730
Non-Argument Calendar

_____

Agency No. A216-272-066

XIUYUN ZHENG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 5, 2020)

Before MARTIN, JILL PRYOR and NEWSOM, Circuit Judges.

PER CURIAM:

Xiuyun Zheng, a native and citizen of China proceeding *pro se*, petitions for

review of the Board of Immigration Appeals' ("BIA") final order affirming the

Immigration Judge's ("IJ") denial of her application for asylum, withholding of

removal, and relief under the United Nations Convention Against Torture ("CAT"). She challenges the BIA's adverse credibility determination, its denial of her claim of political persecution related to China's one-child policy, and its denial of her applications for withholding of removal and CAT relief. After careful review, we grant her petition for review and remand to the BIA for further proceedings.

## I.

Zheng entered the United States without valid entry documents. The Department of Homeland Security ("DHS") issued a notice to appear, charging her as removable as an immigrant without a valid entry document upon admission. *See* Immigration and Nationality Act ("INA") § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I). Zheng admitted the allegations in the notice to appear and conceded removability.

### A. Application for asylum, withholding of removal, and CAT protection

Zheng applied for asylum, withholding of removal, and relief under CAT. She claimed religious persecution for her attendance of a Christian church and political persecution for her violation of China's one-child policy. She alleged that she "was arrested, detained and beaten by the Chinese government because [she]

2

attended Christian underground church" and that "[b]ecause [she] had [an] extra baby, [she] was accused of violating the family planning policy." AR at 176.[1]

Zheng attached several documents to her application, including a personal statement, letters from her husband and a neighbor, and notices from her local village committee reporting her arrest for religious activity. Zheng's personal statement described the harm she suffered on the basis of her religion and political opinion. She claimed that she converted to Christianity and began attending an underground worship group in October 2017. Later that month, she was attending a Bible study at a private home when seven police officers broke into the house and arrested her and the other congregants. She was taken to an interrogation room, where she was slapped, beaten, kicked, and mocked for her faith. She was then detained for approximately 11 days, during which time she was deprived of food. Eventually her husband, Shunfa Yi, paid her bail and she was released, but only after she was forced to write a "guarantee letter" promising to "draw a clear line between [herself] and the evil cult" or otherwise be "sen[t] directly into prison." *Id.* at 188. Upon her release, she was "required to report to [the] village committee every week." *Id.* She fled China shortly thereafter. After she left, "village cadres and police officers came [a] few times to catch [her]." *Id.* She

---

[1] "AR" refers to the administrative record.

feared that if she returned to China she would continue to be persecuted for her religious faith.

Regarding her persecution for violating China's one-child policy, Zheng stated that she was forced to insert an intrauterine device ("IUD") after she gave birth to her first child. The IUD was lost and some years later she became pregnant again. After the family planning office discovered her pregnancy, Zheng hid to avoid apprehension and a forced abortion. After Zheng gave birth, village officials "came again and wanted to sterilize" her, but her doctor "diagnosed that [her] body could not stand sterilization surgery," so officials "forced [her] to insert [an] IUD and attend regular pregnancy checkup[s]." *Id.* at 187. The family had to pay a fine to register their second child onto the village's "household registry." *Id.*

Zheng also submitted a signed statement from Yi, her husband, which corroborated her claims of political persecution. In it, he stated that Zheng became depressed after she had a second IUD forcibly inserted and was forced to pay a fine for having a second child. Zheng was invited to a Christian church and, after she began attending, her mental health improved. Yi stated that Zheng was later arrested at a church member's house during a gathering and "was covered with wounds by the time when she was released." *Id.* at 232. After her release, "the police wanted her to report whenever they like." *Id.* Zheng "was living in fear after she came home" and "was afraid of doing anything because she worried that

4

the police would arrest her again." *Id.*  In another signed statement, Zheng's neighbor, Meizi Lin, stated Zheng was arrested "due to her participation in [a] Christian gathering" and that "[h]er husband bailed her out after 12 days," at which point Zheng had "wounds and injuries all over her body." *Id.* at 238.  Further, Lin stated, Zheng "was not allowed to go far from the town and participate in [any] gathering again." *Id.*

Zheng also attached two village committee notices to her application.  The first, issued before Zheng fled China, reported that she had "participated in [an] illegal underground Christian church event" and had been fined.  *Id.* at 224.  The second, issued after Zheng fled China, said that she had "participated in illegal evil cult's activity" and was "arrested by public security bureau," but had "showed no regret with no correction after her release." *Id.* at 228.  It "demand[ed] her family members to persuade her" to "confess[]" to participating in an "illegal evil cult's activity" or otherwise she would be "severely punished and sentenced." *Id.*

Testifying before the IJ, Zheng reiterated much of her personal statement. She also elaborated on how she fled from China.  Five days after being released from prison, she traveled five hours by train to Guangzhou to obtain a Mexican visa.  After obtaining her visa in Guangzhou, she did not return home; instead she stayed in a nearby village with other family members until departing for Mexico. Although she was supposed to report to the village committee, she told her

husband to make up an excuse for her failure to do so. When authorities came looking for her, he told them that she had left the village to visit a doctor and been hospitalized.

## B. The IJ's decision

The IJ denied Zheng's application in an oral decision, finding that her account of persecution was not credible and that her claims for relief failed on the merits. As to credibility, the IJ found that Zheng's testimony regarding her religious persecution was inconsistent with her corroborating evidence. Emphasizing that her "testimony is inconsistent with the record" and that she had not "otherwise demonstrated by her demeanor that she is credible," the IJ made an adverse credibility determination and denied her application. AR at 78.

The IJ alternatively held that Zheng's claims failed on the merits. It held that the beatings and 11-day detention did not rise to the level of past persecution on account of religion and that forced insertion of an IUD and a fine for violation of China's one-child policy did not amount to past persecution on account of political opinion. The IJ found that Zheng could not demonstrate a well-founded fear of future persecution on account of her political opinion, because, as Zheng acknowledged, China no longer applies the one-child policy. The IJ denied Zheng's claims for withholding of removal and CAT relief based on its conclusion that Zheng failed to demonstrate eligibility for asylum.

6

## C. Appeal to the BIA

Zheng appealed the IJ's decision to the BIA, which affirmed and dismissed the appeal.  The BIA upheld the IJ's adverse credibility determination as to Zheng's religious persecution claim.  In doing so, it relied on three purported discrepancies between Zheng's testimony and other witness accounts: differing accounts of how frequently and to whom Zheng was required to report upon her release from detention; Zheng's uncorroborated testimony that authorities visited her husband to inquire as to her whereabouts; and conflicting accounts of whether Zheng left her house to obtain a Mexican visa upon her release from detention.  The BIA did not rely on the one-day difference in Zheng's and her neighbor's account of how long Zheng was detained after her arrest.  The BIA declined to address the IJ's "alternative determination that [Zheng] did not meet her burden of proof for her religion claim."

The BIA also affirmed the IJ's holding that Zheng failed to meet her burden of proof of showing political persecution based on her violation of China's one-child policy.  Specifically, the BIA agreed with the IJ that the harm Zheng alleged—"that she was nearly sterilized, was forced to have an IUD inserted and charged a fine"—did not amount to past persecution.  AR at 4.  As to Zheng's fear of future persecution, the BIA acknowledged Zheng's concession that China no longer enforces a one-child policy.

7

Zheng timely petitioned this Court for review.

## II.

We review only the BIA's decision, except to the extent that it expressly adopted the IJ's opinion. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). Here, the BIA adopted only two portions of the IJ's decision: its adverse credibility determination and its finding that Zheng failed to prove entitlement to relief based on China's one-child policy. As to these two points, we review both decisions. On all other questions, we refer only to the BIA's decision.

We review *de novo* the BIA's legal conclusions. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016). We review factual findings, including credibility determinations, under the substantial-evidence test. Under that test, we will affirm findings that are "supported by reasonable, substantial, and probative evidence on the record considered as a whole," viewing "the record evidence in the light most favorable to the agency's decision and draw[ing] all reasonable inferences in favor of that decision." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation marks omitted). We reverse only if the record "compels" reversal of the administrative agency's findings of fact. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1351 (11th Cir. 2009). We liberally construe *pro se* filings. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998).

## III.

8

Under the REAL ID Act of 2005, IJs must consider "the totality of the circumstances, and all relevant factors" in determining the credibility of an applicant for asylum. 8 U.S.C. § 1158(b)(1)(B)(iii). This includes the applicant's demeanor when testifying, the consistency between her written and oral statements, the consistency of her statements with other record evidence, and any "inaccuracies or falsehoods in such statements." *Id.* Although the Act does not require that inconsistencies "go[] to the heart of the applicant's claim" to weigh in favor of an adverse credibility determination, it requires the IJ to look to the "totality of the circumstances, and all relevant factors." *Id.* And it does not require courts to abandon reason and proportion in making and reviewing credibility findings. *See Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1305 (11th Cir. 2009) (rejecting an IJ's credibility finding when it was based on an inconsistency which was not "plausible and material"); *Forgue*, 401 F.3d at 1287 (requiring "cogent reasons" for an adverse credibility finding).

After careful review, we conclude that the IJ's credibility finding was not based on substantial evidence. In affirming the IJ's credibility finding, the BIA relied on three purported inconsistencies between Zheng's testimony and other record evidence. But these inconsistencies were either trivial, based on a misunderstanding of the evidence, or not inconsistencies at all. And the IJ repeatedly relied on faulty reasoning and misunderstandings of both the evidence

9

and the legal standards governing credibility determinations. We consider the bases for the IJ's credibility finding in turn.

## A. Zheng's reporting requirements

In finding Zheng not credible, the IJ relied on what it perceived to be inconsistent descriptions of Zheng's reporting requirements after her release from detention. In both her declaration and testimony before the IJ, Zheng stated that she was required to report weekly to the village committee. Yi wrote in his one-page declaration that after Zheng's release "the police wanted her to report whenever they like." AR at 232. And Lin stated that "[g]overnment officials . . . asked her to report" without elaborating on the nature of these reporting requirements. *Id.* at 238. This evidence does not support an adverse credibility finding.

First, we note that the descriptions of Zheng's release conditions were not inconsistent. As Zheng clarified in her testimony before the IJ, she was required both to report weekly to the village committee and to appear whenever summoned by police. Specifically, Zheng testified that, in addition to imposing a weekly village committee reporting requirement, police also told her that "whenever they call [her], summon [her], [she] ha[s] to appear." *Id.* at 146-47. These are readily understandable and facially plausible conditions. They are also consistent with the declarations of her husband and neighbor. That Zheng's husband described only

10

one component of Zheng's reporting requirements in a one-page declaration, which did not purport to be exhaustive, also does not weigh against her credibility.

Indeed, the IJ did not identify any inconsistencies in these statements, finding only that Zheng's testimony was not *corroborated* by other evidence.[2]  But unlike inconsistency, the absence of corroborating evidence alone is not a proper basis for an adverse credibility finding.  Since the passage of the REAL ID Act, this Court has repeatedly recognized that DHS regulations permit noncitizens to establish eligibility for asylum based on their credible testimony alone.  *See* 8 C.F.R. § 208.13 (stating that, for the purpose of establishing eligibility for asylum, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration"); *Niftaliev v. U.S. Att'y Gen.*, 504 F.3d 1211, 1217 (11th Cir. 2007) (approving of the proposition that, in the absence of corroborating evidence, an applicant's testimony alone may be sufficient to establish eligibility for asylum so long as it is "believable, consistent, *and* sufficiently detailed" (internal quotation marks omitted)); *Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1345 (11th Cir. 2008) ("An applicant may be able to meet his

---

[2] The IJ and BIA both considered the fact that the village committee notices do not mention Zheng's reporting requirements.  But neither the IJ nor the BIA explained why these notices would be expected to contain information about the conditions of Zheng's release.  Nothing in the form or content of these one-paragraph notices suggests that they would normally contain such information.  And nothing else in the record supports such a conclusion.  To the extent that the IJ and BIA held otherwise, it was based "solely on speculation and conjecture" and does not merit consideration.  *See Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1278 (11th Cir. 2009).

11

statutory burden by providing uncorroborated but credible testimony . . . .").  That an applicant can establish eligibility for asylum based solely on credible, but uncorroborated, testimony cannot be squared with the IJ's decision that Zheng was not credible for failing to corroborate her testimony.

When this Court has affirmed adverse credibility findings based on lack of corroboration, it has been based on the omission of facts in asylum applicants' *own* prior statements, and only when those omissions were material to their applications.  *See Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1332 (11th Cir. 2011) ("Although [respondent] might reasonably decline to list every detention, his failure to mention any of them supports the IJ's adverse credibility finding."); *Shkambi v. U.S. Att'y Gen.*, 584 F.3d 1041, 1049–50 (11th Cir. 2009) (affirming adverse credibility determination where applicant made "material omissions" central to his persecution claim in his airport interview and credible-fear interview); *Forgue*, 401 F.3d at 1287–88 (holding that substantial evidence supported adverse credibility finding where asylum applicant had failed to mention prior political activities and severe physical assaults prior to testimony).  And we have required "reasonable explanations" for adverse credibility findings based on omissions in prior statements.  *Shkambi*, 584 F.3d at 1048.  Unlike omissions in supporting evidence, there are good reasons to consider material omissions from an applicant's own statements in evaluating her credibility.  The failure to mention

12

significant events relevant to an asylum claim at early stages of the process suggests that the applicant may have later invented or embellished elements of her claim, especially when she is unable to provide a satisfactory explanation for the omission. But friends and family members preparing corroborating declarations often will have no reason to think that their statements need mention every detail, particularly when that detail is not central to the applicant's claim.

Even if we were to consider omissions in Yi and Lin's statements, our precedent still would not support the IJ's credibility determination. First, the omissions here were not material to Zheng's claim, as they related only to a peripheral question, her conditions of release. Second, Zheng provided a plausible explanation for the omission: that she was in fact subject to both conditions of release. And third, the IJ provided no reasoned explanation of why this omission undermined Zheng's credibility or why her explanation of the omission was unsatisfactory.

This factor thus was not a proper basis for the IJ's adverse credibility determination.

## B. Zheng's flight from China

Next, the IJ pointed to purported inconsistences between Zheng's account of her escape from China and Yi's and Lin's declarations describing Zheng's treatment after her release from prison. Zheng testified that after she was released

13

from detention members of her church encouraged her to flee to the United States and suggested she go to Guangzhou to obtain a travel visa. She traveled to Guangzhou and obtained a visa from the Mexican embassy. To help evade her reporting requirements, Yi told the village committee that she had been hospitalized. After leaving for Guangzhou, Zheng never returned home, staying in hiding with her mother in a different village until her departure for Mexico.

The IJ thought this inconsistent with Yi's declaration, which said that after Zheng was released from detention "[s]he could not leave far away from home," "could not participate in gathering," and "was living in fear . . . of doing anything because she was worried that the police would arrest her again." AR at 88, 232. But of course the fact that Zheng was afraid of leaving her home does not mean that she did not do so—people frequently do things they fear, especially when circumstances require them to act to escape persecution. That people take action and leave their homes despite fear of coercive government action is, in fact, a fundamental assumption of our asylum law, which requires a demonstration of credible fear of persecution by or with the sanction of the government. *See* 8 C.F.R. § 208.13(b).

The IJ also seems to have misinterpreted the evidence and believed that Zheng returned to her home between travelling to Guangzhou to obtain a visa and departing for Mexico. But that is not what she said she did. Misapprehension of

14

the record is not a proper basis for an adverse credibility determination. *See Kueviakoe*, 567 F.3d at 1306 (granting petition for review where finding of inconsistency was based on misreading of the record). Perhaps the IJ thought that the conditions of Zheng's release made it impossible for her to leave home, making her tale of escape implausible. But the record supports that Zheng was required to report to the village committee weekly and also when requested by law enforcement, not that she was subject to continuous surveillance or other restraint that would prevent her flight. And Zheng gave a plausible explanation for how she evaded apprehension: she hid out and her husband lied to officials to cover her tracks.

This factor also was not the proper basis of an adverse credibility determination.

## C. Yi's interactions with local officials

Finally, the IJ took issue with the fact that Yi's declaration did not mention that village committee meeting members inquired into Zheng's whereabouts or that he lied to them to conceal her flight. As we have already discussed, such an omission does not support an adverse credibility finding. Indeed, it requires no great leap to imagine why a Chinese citizen might be reluctant to draft and submit a signed document stating that he lied to government authorities to assist his wife's escape. This factor also was not the proper basis for the IJ's credibility finding.

15

Because the IJ's credibility finding had no proper evidentiary basis, the record compels us to conclude that it was not supported by substantial evidence.[3]

## IV.

Even if the IJ's credibility determination was supported by substantial evidence—and it was not—the IJ also erred by failing to consider corroborating record evidence. After making an adverse credibility determination, the IJ is still required to "consider *all* evidence introduced by the applicant." *Forgue*, 401 F.3d at 1287; *see also Carrizo*, 652 F.3d at 1332. Here, Zheng submitted one government document confirming that she was arrested and fined for her religion and another stating she would face severe punishment if she does not recant her religious beliefs. These both corroborate Zheng's claim of past persecution and support a credible fear of future persecution if she were returned to China. Yet the IJ did not consider these documents. Nor did the IJ give any reasons for disregarding the declarations of Zheng's husband and neighbor, which corroborate the core claims of Zheng's asylum application. Rather, the IJ "reli[ed] solely on an

---

[3] The IJ also noted that, whereas Zheng testified that she was detained for 11 days, her neighbor's declaration stated that Zheng was detained for 12 days. It is unclear whether the IJ relied on this discrepancy in making his credibility finding, as he described it as "just an initial inconsistency and the Court points it out for the purpose of making the record clear in this case." AR at 87. Even if the IJ relied on it, the BIA did not adopt this portion of the opinion, instead relying on other purported discrepancies, so we are not required to review it. *See Kazemzadeh*, 577 F.3d at 1350.

16

adverse credibility determination" in denying Zheng's claim. *Forgue*, 401 F.3d at 287. This is not permitted under this Court's precedent and independently warrants remand.

## V.

As to her political asylum claim based on China's one-child policy, Zheng acknowledges that the harm she suffered on account of this policy "might not have amounted to persecution." Appellant Br. at 29. She also acknowledges that China's "policy has changed" and her prior violation of that policy demonstrates her fear "[t]o a much lesser degree" than her religion. *Id.* at 46. Considering Zheng's concession that China no longer enforces a one-child policy, substantial evidence supports the BIA's conclusion that she cannot show a well-founded fear of future persecution based on her violation of this policy. She also cannot satisfy the more stringent requirements for withholding of removal or CAT protection on this ground.

## VI.

For the above reasons, we reverse the agency's adverse credibility finding and remand for further proceedings. We affirm the denial of Zheng's petition for asylum, withholding, and CAT relief on the basis of political persecution for her violation of China's one-child policy.

**PETITION GRANTED.**

17