[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13093
Non-Argument Calendar
_____

Agency No. A088-377-994


XIANGLAN CUI,

                                                            Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                            Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(March 28, 2014)

Before CARNES, Chief Judge, HULL and FAY, Circuit Judges.

PER CURIAM:

      Xianglan Cui appeals the Board of Immigration Appeals' affirmance of the

Immigration Judge's denial of her application for asylum, withholding of removal,

and relief under the United Nations Convention against Torture (CAT).  See  8

U.S.C. § 1158(a); id. § 1231(b)(3); 8 C.F.R. § 208.16(c).  Cui contends that the IJ's

adverse credibility determination, which the BIA adopted, is not supported by

substantial evidence and that her testimony together with the corroborating

evidence she submitted was sufficient to meet her burden for asylum, withholding

of removal, and relief under CAT.

## I.

Cui, a Chinese national, claims to have left China in September 2006 and

entered the United States through its border with Mexico in December 2006.[1]  She

did not make her presence known to government authorities until June 15, 2007,

when she filed an asylum application with the Department of Homeland Security.

Two months after Cui filed that application, she was served with a notice to appear

in removal proceedings before the immigration court.  In a hearing before that

court, Cui conceded removability but indicated that she wished to seek asylum,

withholding of removal, and protection under CAT.

Cui based her claim for asylum on the Chinese government's supposed

persecution of her for her stand against governmental corruption.  She alleged that

she used to own and operate a successful clothing store in Helong City, in the Jilin

---

[1] The government contests Cui's version of even the most basic facts, including when and where she entered the United States.  The IJ also questioned whether China was in fact her country of origin.

2

Province of China but that she left after suffering abuse at the hands of the government. According to Cui, the abuse first took the form of extortion; local government officials would come to her store and take money and goods from her. Then, in March 2005, the authorities told her that she needed to close her store to make way for a governmental construction project. Cui maintains that she and other business owners gathered together and that they elected her to serve as their leader and representative. After receiving what she believed to be an inadequate offer of compensation for the government's taking of her store, Cui submitted a petition to the government asking for more compensation. She received no response. Shortly afterward, according to Cui, she and the other storeowners received a notice from the government informing them that they needed to shut down their stores in seven days.

Cui contends that she and approximately thirty-three other merchants then went to the local government building to protest their treatment with a "sit-in strike" and demanded to see the government official in charge. Their request was not granted; according to Cui, the police took her and some of the others inside the building for interrogation, where they were beaten and abused. Cui maintains that some of the shopkeepers were released after agreeing to obey the government but that she and a few others were taken to jail because they refused to obey.

While in jail, Cui reports that she was beaten by police and other inmates, sexually assaulted, and doused with urine.  She testified that she was detained for ten days and was released only after agreeing to sign a confession and pay a fine of 5,000 yuan.  As part of her punishment, Cui stated that she also had to report to the police regularly after her release.  Cui claimed to have suffered numerous injuries while in custody and submitted medical records showing that she received treatment for clavicular and patellar fractures and a head injury.  Her clothing store was allegedly closed down by the end of November 2005, and the government paid her 50,000 yuan in compensation for it.

Cui testified that she submitted another claim to the government complaining of insufficient compensation in April 2006.  She further alleged that her claim angered the police and caused them to come to her house in June 2006.  On that day, according to Cui, the police threatened to kill her, which prompted her to leave China.

Cui submitted a number of documents in support of her claims, including a statement from her husband, Jingchun Zheng; notices issued to Cui from the city government ordering her to demolish the store because it was "illegal construction"; a record of a fine for "demolition and relocation" dated November 30, 2005; medical records indicating that she received treatment for injuries between December 3 and December 30, 2005; and a report on human rights in

4

China published by the United States Department of State.  She later supplemented this batch of documents with another notice from the city which said that Cui's business needed to be demolished because it was "within the scope of urban re-planning"; a police clearance demonstrating that she had no criminal history, which had been notarized and translated into English in 2003; and an additional letter from her husband — which was signed under another name, "Youngchoon Chung."

The IJ held a hearing in this matter on June 26, 2012.  Cui was the only witness at her hearing, and at the conclusion of her testimony, the IJ denied all applications for relief.  The IJ made an adverse credibility finding, noting several inconsistencies in Cui's testimony and documentary evidence and that Cui had provided very little evidence to corroborate her story.  Finally, the IJ found that, even if Cui's allegations were true, there was no nexus between her purported persecution and any of the five statutorily-protected grounds for asylum.  See 8 U.S.C. § 1158(b)(1)(B)(i) (explaining that an asylum applicant "must establish that race, religion, nationality, membership in a particular group, or political opinion was or will be at least one central reason for [her] persecut[ion]" in order to

prevail).  The court therefore issued an order of removal to China or, in the alternative, to South Korea.[2]

Cui petitioned the BIA for review of the IJ's decision, arguing that the IJ's adverse credibility determination was clearly erroneous and that the IJ erred in denying her relief because she had established past persecution on a protected ground and had a well-founded fear of persecution if she were to return to China. The BIA disagreed.  It upheld the IJ's adverse credibility finding and concluded that the corroborative evidence, viewed apart from Cui's discredited testimony, could not independently satisfy her burden of proving eligibility for asylum, withholding of removal, and protection under CAT.  Having decided the case on those grounds, the BIA did not reach the issue of whether Cui met her burden of establishing a nexus between her alleged persecution and one of the five enumerated grounds for asylum.  The BIA dismissed Cui's appeal of the IJ's decision, and she petitioned this Court for review.

II.

---

[2] Despite the fact that Cui submitted identifying documents such as a Chinese passport and ID card, the IJ found that she had not established that she was from China.  Because Cui's name, according to her own testimony, is interchangeable in Chinese and Korean, and because Cui used a Korean interpreter instead of a Mandarin interpreter, the IJ issued an alternative removal order to South Korea.  Cui's explanation is simply that she is ethnically Korean but legally Chinese.  Jilin Province, the region of China from which Cui hails, borders Korea, and she claims that she is fluent in both Korean and Mandarin.

Where the BIA issues its own decision but expressly adopts the IJ's opinion or reasoning, we review both the BIA's and the IJ's decisions. Xia v. U.S. Att'y Gen., 608 F.3d 1233, 1239 (11th Cir. 2010). The BIA in this case expressly adopted the IJ's adverse credibility determination, so we review both the BIA's and IJ's reasoning and conclusions regarding that issue. See Ayala v. U.S. Att'y Gen., 605 F.3d 941, 948 (11th Cir. 2010) ("Because the Board explicitly agreed with several findings of the immigration judge, we review the decisions of both the Board and the immigration judge as to those issues."). Administrative factfindings, including credibility determinations, are reviewed under the highly deferential substantial evidence test, which requires us to affirm the agency's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1344 (11th Cir. 2008) (quotation marks omitted). We will "reverse a finding of fact only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough." Id. at 1345.

Under the Immigration and Nationality Act, the government has discretion to grant asylum to an alien present in the United States if the alien establishes that she is a "refugee," which is defined, in part, as an alien who is unable or unwilling to return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or

7

political opinion." 8 U.S.C. § 1158(b)(1); id. § 1101(a)(42)(A). Thus, an asylum applicant must, with specific and credible evidence, establish (1) past persecution on account of an enumerated ground, or (2) a well-founded fear of future persecution on account of a statutorily-protected ground. Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006). To qualify for withholding of removal, an alien must satisfy the more stringent standard of demonstrating that it is "more likely than not that [he] will be persecuted or tortured" upon being returned to his country. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005). An applicant for CAT protection must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1239 (11th Cir. 2007). Thus, an alien who cannot meet the standard for asylum generally cannot qualify for withholding of removal or protection under CAT. See Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1288 n.4 (11th Cir. 2005).

Because Cui's application for asylum was filed after May 11, 2005, it is governed by the REAL ID Act of 2005, which provides that an adverse credibility determination may be based on any number of circumstances, including the applicant's demeanor, the plausibility of her account of events, the consistency among the various sources of evidence, the internal consistency of each oral or written statement, and any inaccuracies in those statements. See 8 U.S.C.

8

§ 1158(b)(1)(B)(iii).  An IJ may base a finding of adverse credibility on inconsistencies regardless of whether they go "to the heart of the applicant's claim," id., but such a finding must be "supported by specific, cogent reasons," Li Shan Chen v. U.S. Att'y Gen., 672 F.3d 961, 964 (11th Cir. 2011) (quotation marks and citation omitted).  We have held that even one inconsistency and one omission in a petitioner's testimony can support an adverse credibility finding.  See Xia, 608 F.3d at 1240–41.  If an applicant relies solely on her testimony, an adverse credibility determination alone may be sufficient to support the denial of her application.  Forgue, 401 F.3d at 1287.  Because Cui submitted other evidence of persecution, however, the IJ was bound to consider that evidence and could not rely solely on the determination of adverse credibility.  Id.

## III.

## A.

The IJ and the BIA focused on inconsistencies in the following areas of Cui's testimony, application, and documentary evidence:  (1) the reasons the Chinese government gave for taking Cui's business property; (2) the date on which the government sought to confiscate the property; (3) how often Cui was required to report to the police after being released from jail; (4) the type of injuries Cui suffered during her time in jail; and (5) the length of her hospitalization and

9

treatment after she was released from jail.[3]  Deciding whether the IJ's adverse credibility determination was supported by "specific, cogent reasons" requires examining each of these supposed inconsistencies.  Li Shan Chen, 672 F.3d at 964.  And in this case, not every one of them is supported by substantial evidence in the record.

The IJ and BIA were under the impression that there is an inconsistency about the date Cui claimed that the Chinese government first notified her that her store needed to be closed.  There isn't.  The record shows that Cui consistently represented that the date was March 5, 2005.  The IJ and BIA also found that there was an inconsistency regarding whether the Chinese government took her store because of "urban planning" or because of "illegal construction," but that may be a mere semantic difference.  As Cui explains, "illegal construction" and "urban planning" are not necessarily inconsistent reasons for the government taking.  It is entirely possible that the Chinese government deemed the store to be illegally constructed because it interfered with the government's urban development plans.

For those reasons, these purported inconsistencies, standing alone, would not be sufficient to support the IJ's adverse credibility determination.  See Tang v. U.S.

---

[3]  The BIA also listed as an "inconsistency" the IJ's finding "that a Chinese criminal clearance document was prepared/translated into English approximately two years prior to her persecution and arrival in the United States," but that label is misleading.  Her possession of that document was not the problem.  Instead, it was her explanation for having the document translated before the claimed date of her persecution and flight from China that the IJ found implausible.

Att'y Gen., 578 F.3d 1270, 1278 (11th Cir. 2009) (noting that an adverse credibility determination must rest on more than speculation, conjecture, or personal perceptions). But there are other inconsistencies that the record does support, and those, coupled with Cui's implausible explanation for possessing a translated police clearance document, provide sufficient support for the IJ's credibility determination. Although the evidence in the record might also support a different finding, we do not "re-weigh the evidence from scratch," Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001), and we will not reverse the IJ's credibility determination unless the record compels a contrary conclusion, Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). For the following reasons, the record does not compel us to reverse the IJ's finding of adverse credibility.

First, there are the inconsistencies that actually do exist. The IJ found (and the BIA agreed) that Cui had provided conflicting information about how often she had to report to the police after she was released from jail. The personal statement Cui attached to her original application for asylum and her testimony at the hearing indicated that she was required to report to the police once a month. However, in her updated statement (submitted in 2012), Cui stated that she had to report only once every three months. When confronted with this discrepancy, Cui attributed it to a typographical error. The IJ did not credit that explanation.

11

There was also an inconsistency regarding the length and location of her medical treatment. Cui testified that she went to the hospital after her release from detention on November 30, 2005 and remained there for a month. However, the documentary evidence she submitted shows one hospital stay at Longjing City Traditional Chinese Hospital from December 3rd to December 18th and then another stint at Xinhua Village Medical Station (also in Longjing City) from December 20th to December 30th. The IJ believed that Cui's failure to testify about her switch from medical treatment centers was a significant omission. When confronted with the discrepancy, moreover, Cui gave an inaccurate answer. She testified that she left the hospital only momentarily in order to see a specialist and then came right back, but the documentary evidence contradicts that version of events. The receipt from Longjing City Hospital shows a discharge date of December 18, and Cui has submitted no evidence that she later received additional treatment from that facility. The IJ was also troubled by the fact that Cui's husband, who supposedly transported her to and from the hospital and specialist, did not mention in his letter her hospital stay or that he had taken her to see a specialist.

Finally, there were inconsistencies in Cui's account of the type and extent of her injuries. Her initial personal statement (submitted in 2007 in connection with her original application for asylum) mentioned abuse but did not indicate that she

suffered any serious injuries or required medical treatment.  At her hearing, however, Cui testified about serious injuries in a way that conflicted not only with her personal statement but also with the documentary evidence she had provided. For example, Cui testified that her collar bone and wrist were fractured as a result of the abuse she suffered in jail.  When counsel for the government asked why she included in her personal statement that she was kicked and had her hair pulled but did not include anything about these more serious injuries, Cui said that she did not learn of those injuries until "after I was reviewed by my doctor."  The IJ, who understandably found that answer unconvincing, pointed out that she was examined by her Chinese doctor long before she filled out an asylum application. The IJ then asked whether Cui had suffered a broken or fractured bone in any other place on her body, and Cui said no.  However, Cui had submitted medical documentation from the Longjing City Hospital indicating that she also suffered a "[p]atellar fracture."  When confronted with this inconsistency, Cui stated that she had not mentioned it in her earlier testimony because her "knee bone was not broken or cracked."[4]  The IJ pressed her on this point, inquiring why she would

_____

[4] It is true, as Cui points out in her brief to this Court, that she had earlier testified that "my bone was cracking everywhere, my shoulder and my leg."  But the fact that Cui's testimony varied over the course of the hearing when discussing the same subject does not weigh in favor of her credibility.  Cui's explanation for the inconsistency — that she knew she injured her knee but did not know it was broken or cracked — also conflicts with her earlier testimony that her bone was "cracking everywhere," including in her leg.

have submitted medical documentation saying that the kneecap was fractured if it were not, and Cui said, "I don't know."

Cui also testified inconsistently about a head injury she sustained while in custody. On cross-examination, Cui was asked whether she had "any injury at all on [her] head." She responded: "[M]y head was not injured but because of a trauma I suffered . . . I got a treatment. I suffer from severe headache so for that I received some treatment." Cui went on to clarify that her headaches were psychiatric in nature, brought on by stress. She explained that, "as soon as I saw the policeman that I got scared and I suffered from severe headache." Just moments later, however, when questioned by the IJ, Cui changed course and testified that the policemen had hit her in the head with their truncheons which caused her head to bleed. "Why did you just tell the government that you had no injuries to your head?" the IJ asked. Cui responded, "What I meant was I don't have a scar anymore." Medical records Cui submitted indicated that she did suffer a "scalp injury" that was characterized by severe bruising.

In addition to those inconsistencies, the IJ discredited Cui's testimony due to her explanation — which the IJ found to be implausible — for possessing a police clearance form that had been translated into English and notarized on February 6, 2003. Suspecting that Cui had been planning to come to the United States years before her supposed showdown with the Chinese government, counsel for the

14

Department of Homeland Security asked her why she had this document translated into English in 2003 if she did not enter the United States until 2006. Cui first said that the document "was intended to do something in China," and that she would need it to obtain employment in China. When asked why she would have the document translated into English to do something in China, Cui said that it was just a common thing to do in China at that time. She then said that she thought she might one day conduct business overseas, in which case the document might come in handy. The IJ rejected that explanation, stating that "it was more likely that [Cui had the document translated] in anticipation of her coming to the United States and it is also more likely than not that she was already planning from 2003 to come to the United States and had begun getting her documents in order."

In light of the discrepancies, omissions, and implausible explanations in Cui's evidence, the IJ was justified in making an adverse credibility determination. See Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1255 (11th Cir. 2006) ("Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments."). That determination (and thus, the BIA's adoption of it) was "supported by specific, cogent reasons," Li Shan Chen, 672 F.3d at 964, and Cui has not met her burden of establishing that "the record compels a reversal" of it, Mohammed, 547 F.3d at 1344 (quotation marks omitted).   See Forgue, 402 F.3d at 1287.

15

B.

An adverse credibility determination alone may provide sufficient support to affirm the BIA's denial of relief.  Forgue, 401 F.3d at 1287.  And this is especially true where the corroborating evidence is weak or nonexistent.  See Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) ("The weaker an applicant's testimony . . . the greater the need for corroborative evidence.").  However, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant."  Forgue, 401 F.3d at 1287.  For that reason, we must consider whether substantial evidence supported the IJ's and BIA's conclusion that Cui failed to establish (1) past persecution on account of an enumerated ground, or (2) a well-founded fear of future persecution on account of a statutorily-protected ground.  Chen, 463 F.3d at 1231.

The IJ and BIA agreed that, "[a]part from [Cui's] discredited testimony, her corroborative evidence did not independently satisfy her burden of proving eligibility for asylum."  And the IJ specifically found that Cui had failed to provide any corroboration from other members of the protest group she had supposedly been elected to lead, which was suspicious in light of her contention that there were about thirty merchants who took part in the protests.  More troublesome, however, was the fact that Cui's husband's letters failed to mention a significant event about which Cui had testified — that Chinese law enforcement had come to

16

their home five or six times, causing him to flee the city.  Cui's husband also indicated that the Chinese government tried to confiscate Cui's store in 2004, as opposed to the 2005 date Cui gave.  These were not the only problems with Cui's corroborating evidence — or lack thereof — but they are sufficient to permit the IJ to conclude that Cui had failed to carry her burden through the corroborative evidence she submitted.  See Siewe v. Gonzalez, 480 F.3d 160, 170 (2d Cir. 2007) ("[A] single false document or a single instance of false testimony may (if attributable to the petitioner) infect the balance of the alien's uncorroborated or unauthenticated evidence.").

Cui contends that she submitted sufficient documentary evidence to sustain her burden and that any gaps in her corroborative evidence are excusable because the evidence was not reasonably available.  What she fails to recognize is that it is not enough for her to submit some documentary evidence that supports some of her claims and chalk up the gaps and any missing documents to unavailability.  Cui points out that her husband's statement "did corroborate significant aspects of her claim," but we must also consider that it omitted significant events in the narrative and misstated the date on which the Chinese government allegedly contacted him and Cui about the confiscation of her store.  The IJ wondered why Cui had neglected to submit any of the complaints she filed with the government, which, the IJ found, should have been available to Cui because she authored them.  Cui

17

responds that such evidence was not reasonably available because she fled the country fearing for her life.  This may be true, but that does not change the fact that Cui did not carry her burden.  See Forgue, 402 F.3d at 1287.

In short, as the IJ and BIA found, Cui's testimony is not credible, the corroborating evidence she submits is marred by inconsistency, and the remaining evidence that might be corroborative is unavailable.  A record characterized by those problems does not compel us to reverse the agency's decision.  The BIA's judgment is therefore **AFFIRMED**.